## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **United States of America,** | **Case No.  1:18cr33** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Ashis Rakhit, et al.,** | |
| **Defendants** | **MEMORANDUM OPINION AND ORDER** |

Currently pending are the Motions of the Plaintiff United States to (1) Compel Defendants' Compliance with Fed. R. Crim. P. 16(b) (Doc. No. 103); (2) Enforce Administrative Subpoenas against Defendants (Doc. No. 104); and (3) Enforce Administrative Subpoenas against Ohio Cardiology Associates, Inc. and Ashis K. Rakhit, M.D., Inc. (Doc. No. 110.)  Also pending is the Motion of Defendants Ashis Rakhit and Jayati Gupta Rakhit for a Protective Order.  (Doc. No. 106.) Briefs in Oppositions were filed in June and July 2020, followed by Reply Briefs.  (Doc. Nos. 105, 108, 109, 116, 117, 118.)

For the following reasons, Plaintiff's Motion to Compel Compliance with Rule 16(b) (Doc. No. 103) is GRANTED IN PART and DENIED IN PART, as set forth herein.  Defendants' Motion for Protective Order (Doc. No. 106) is GRANTED, and Plaintiff's Motion to Enforce Administrative Subpoenas against the Defendants (Doc. Nos. 104) is DENIED.  Lastly, Plaintiff's Motion to Enforce Administrative Subpoenas against Ohio Cardiology Associates, Inc. and Ashis K. Rakhit, M.D., Inc. (Doc. No. 110) is GRANTED.

## I.      Background

Defendants Ashis Rakhit ("Dr. Rakhit") and Jayati Gupta Rakhit ("Dr. Gupta") are husband and wife medical doctors who specialize in cardiovascular disease and internal medicine.  (Doc. No. 46 at ¶ 1.)  In the mid-1990s, Dr. Rakhit formed Ashis K. Rakhit, M.D., Inc., and Dr. Gupta formed Ohio Cardiology Associates, Inc.  (*Id*. at ¶ 2.)  Collectively, Defendants had four practice locations, in Cleveland, Strongsville, and Parma, Ohio.  (*Id*. at ¶ 3.)

On January 17, 2018, Defendants were indicted on multiple counts of (1) conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 1); (2) health care fraud in violation of 18 U.S.C. § 1347  and 2 (Counts 2 through 12); (3) false statements relating to health care matters in violation of 18 U.S.C. § 1035 and 2 (Counts 13 through 18); and (4) distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and (b)(2) (Counts 19 through 24).  (Doc. No. 1.)  The Indictment charged that, from January 2011 to the present, Defendants illegally distributed prescription-controlled substances to customers located in the Northern District of Ohio, including prescriptions for oxycodone, tramadol, and alprazolam.  (*Id.* at ¶ 23.)  It further charged that, during this same time period, Defendants committed health care fraud by submitting billings to Medicare and Medicaid for services that were not medically necessary, or by using inflated or "upcoded" codes that reflected services more costly than those which were actually performed.  (*Id.* at ¶¶ 35.)  Lastly, Defendants were charged with knowingly making materially false and fraudulent statements in connection with claims for reimbursement, including false diagnoses for certain patients.  (*Id.* at ¶ 44.)

On January 23, 2018, law enforcement agents executed search warrants at the Defendants' practice locations.  (Doc. No. 104 at p. 2.)  On that same date, the Government served administrative subpoenas *duces tecum* on (1) Dr. Rakhit, (2) Dr. Gupta, (3) Ashis K. Rakhit, M.D., Inc.; and (4)

Ohio Cardiology Associates, Inc.  (Doc. No. 104-1.)  These subpoenas were issued pursuant to 18

U.S.C. § 3486 and, among other things, required the recipients to preserve and produce medical and

billing records relating to 265 patients, listed in Attachment B to the subpoenas.  (Doc. No. 104-2 at

PageID# 2040.)  Specifically, Specifications 11 and 12 to the subpoenas provide as follows:

> For the Subpoena Period, provide the following:
>
> > ***
>
> 11. All documents that relate to any amount charged by or amount reimbursed to [the subpoena recipient] for any procedure, treatment or related service provided to the beneficiaries listed in Attachment B, including, but not limited to, superbills, claims, remittance notices, explanation of benefits, and other documents that relate to the description of the procedure, service, or treatment, and to any codes and units of service billed. Please include all correspondence with these patients.
>
> 12. The complete medical records for the beneficiaries listed in Attachment B, including, but not limited to: (a) orders, (b) facility and/or clinical records, (c) treatment plans, (d) SOAP notes, (e) history and physical examinations, (f) physician progress notes, (g) nursing notes, (h) any staff notes relating to cardiology and/or internal medicine, (i) daily treatment notes, (j) flow sheets, (k) equipment supply/order sheets, (l) labs and diagnostic test results, (m) nuclear stress tests results, including the nuclear camera file, (n) all catheterization films in digital or other format.

(*Id*.)

On March 27, 2018, the United States served another set of administrative subpoenas pursuant

to 18 U.S.C. § 3486, again on (1) Dr. Rakhit, (2) Dr. Gupta, (3) Ashis K. Rakhit, M.D., Inc.; and (4)

Ohio Cardiology Associates, Inc.  (Doc. No. 104-3.)  These Subpoenas sought the same material as

the January 2018 subpoenas but with respect to 32 additional patients.  (*Id*.)  The United States

indicates that each of these subpoenas were served on counsel for the named Defendants.  (Doc. No.

104 at p. 4.)

On April 10, 2018, counsel for the United States emailed defense counsel for an update

regarding Defendants' production in response to the subpoenas.  (Doc. No. 104-4.) In that email,

counsel for the Government stated that "[a] lot of what we requested was seized during the execution of the search warrant, but we believe that nine of the patient files listed in the subpoenas were not located during the search and we would like the files produced or a written response explaining why they are not being produced." (*Id.*)  Then-defense counsel William Beyer responded that same day with an email confirming a conversation between the parties regarding this issue.  (Doc. No. 104-5 at PageID# 2088.)  Therein, Mr. Beyer stated that "we will look for the patient files for the 9 individuals. (*Id.*)  However, Mr. Beyer also requested that "the government will provide us with case law that supports its position that post indictment administrative subpoenas must be complied with." (*Id.*)  In response, the United States identified the Sixth Circuit's decision in *United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993) as support for its use of post-indictment administrative subpoenas.  (Doc. No. 104-5 at PageID# 2087.)  Counsel for the Government asked defense counsel to "please let us know if we will need to move under 18 U.S.C. § 3486(c) to enforce the subpoenas." (*Id.*)

On April 25, 2018, defense counsel Richard Blake produced responsive documents on behalf of both Defendants, as well as on behalf of Ashis Rakhit, M.D., Inc. and Ohio Cardiology Associates, Inc. (hereinafter referred to as the "Corporate Entities"). (Doc. No. 104-6.)  According to the U.S., this production included the Defendants' files for six of the nine missing patients. (Doc. No. 104-7.)

Thereafter, on May 3, 2018, the United States served additional administrative subpoenas pursuant to 18 U.S.C. § 3486, on both Defendants and the Corporate Entities.  (Doc. No. 104-8.) These Subpoenas sought the same material as the January and March 2018 subpoenas but with respect to one additional patient, who will be identified as M.Y.  (*Id.*)  The United States avers that each of these subpoenas were served on counsel for the named Defendants.  (Doc. No. 104 at p. 5.)

4

Meanwhile, Dr. Rakhit invoked Fed. R. Crim. R. 16 and demanded discovery from the United States.  (Doc. No. 19.)  The United States complied on March 28, 2018 and followed up with a number of supplemental discovery disclosures throughout 2018.  (Doc. No. 103 at p. 3.)  Additionally, in September 2018, the United States produced the expert report of professional coder Sonda Kunzi regarding seven bills submitted for four patients.  (*Id.* at p. 12.)  Several months later, in November 2018, the United States produced the expert report of cardiologist Robert Biederman, M.D., regarding cardiac testing of four patients.  (*Id.*)

On January 16, 2019, the grand jury returned a Superseding Indictment against Dr. Rakhit and Dr. Gupta, which added numerous charges of health care fraud and unlawful distribution of controlled substances.  (Doc. No. 46.)

The United States made supplemental discovery disclosures to Defendants in February, June and November 2019.  (Doc. No. 103 at p. 3.)  Additionally, the United States produced (1) two additional expert reports from Ms. Kunzi in February 2019; and (3) three updated and/or additional expert reports from Dr. Biederman in February, May, and August 2019.  (*Id.* at pp. 12-13.)  The United States also disclosed expert reports from cardiologist Ian Gilchrist, M.D., in February, April, and August 2019, as well as an expert report from pain management physician Milton Landers, M.D., regarding controlled substance prescriptions in June 2019.  (*Id.*)

On December 17, 2019, the United States served an administrative subpoena on Defendants and Ohio Cardiology Associates, Inc., pursuant to 18 U.S.C. § 3486.  (Doc. No. 104-9.)  This subpoena sought the production of "all patient medical records" from January 24, 2018 through the present for thirteen (13) specific patients.  (*Id.*)  According to the United States, this subpoena was served on counsel for Defendants.  (Doc. No. 104 at p. 5.)

5

On January 29, 2020, defense counsel Steven Bradley produced responsive documents for two of the thirteen patients identified in the December 2019 subpoena.  (Doc. No. 104-10.)

The following month, Defendants produced the expert reports of (1) Jacqueline Bloink, M.B.A. (Doc. No. 103-6); (2) cardiologist Bruce Charash, M.D. (Doc. No. 103-5); (3) family physician William Miser, M.D. (Doc. No. 103-8); and (4) cardiologist Jonathan Marmur, M.D. (Doc. No. 103-10).  In March and April 2020, Defendants produced two expert reports from pain management physician Edgar Ross, M.D. (Doc. Nos. 103-11, 103-12), as well as an expert report from registered nurse Kori Wendt, RN (Doc. No. 103-14.)

Several months later, in June 2020, Defendants produced the expert reports of cardiologists Samin Sharma, M.D. (Doc. No. 103-13) and Michael Langer, M.D. (Doc. No. 103-9.)  Additionally, on June 3, 2020, as part of their reciprocal discovery obligation under Fed. R. Civ. P. 16(b), Defendants produced 647 pages of medical records for two patients, who will be identified herein as C.D. and R.N.  (Doc. No. 103 at p. 3-4.)

On June 11, 2020, the United States filed a Motion to Compel Defendants' Compliance with Fed. R. Crim. P. 16(b).  (Doc. No. 103.)  Therein, the United States argues that some of the medical records recently produced by Defendants relating to C.D. and R.N. had not previously been located by or produced to the Government, despite the fact that both patients were expressly identified in the January 2018 and December 2019 administrative subpoenas.  (*Id*. at p. 4.)  The United States asserts that Defendants' failure to timely produce these medical records was prejudicial and in violation of Defendants' reciprocal discovery obligations under Fed. Crim. R. 16(b)(1)(A).  (*Id*. at pp. 5-8.)  The United States argues that "the Court should enter an order requiring Defendants to produce

immediately any items characterized under Rule 16 for discovery and prohibit the introduction at trial of any items that were discoverable but not disclosed to the government."  (*Id*. at p. 8.)

The United States further argues that Defendants' expert disclosures are deficient under Fed. R. Crim. P. 16(b)(1)(C).  Specifically, the United States asserts that: "[s]ome of the Defendants' expert reports fail to contain an adequate summary of the proposed expert's opinion. Some reports fail to describe the bases for the proposed expert's opinion. And some fail both requirements." (*Id*. at p. 14.)  The United States asks the Court to issue an Order compelling Defendants to comply with their expert witness obligations with respect to seven of Defendants' expert reports.  (*Id*. at pp. 14-20.)

In addition, on that same date, the United States filed a Motion to Enforce Administrative Subpoenas.  (Doc. No. 104.)  Therein, the United States argues that each of its administrative subpoenas satisfy the requirements for enforcement under Sixth Circuit law.  (*Id*. at p. 6.)  The United States "insists on production of all responsive material that has not been previously produced," but in particular requests that the Court order Defendants to produce certain nuclear stress test ("NST") images for two patients, who will be referred to as S.F. and S. S.  (*Id*. at pp. 6-7.)

Defendants opposed both Motions and filed their own Motion for Protective Order.  (Doc. Nos. 105, 106.)  Defendants maintain that they have fully complied with their reciprocal discovery obligations under Rule 16(b)(1)(A) because they have disclosed all documents that they currently intend to use in their case in chief at trial.  (Doc. No. 105 at pp. 2-3.)  Defendants further assert that they will "continue to scrutinize documents in their possession and control and will timely supplement their discovery production" before trial.  (*Id*. at p.3.)  With regard to their expert reports, Defendants

argue that each of their expert reports comply with the "minimal notice requirements" set forth in Rule 16(b)(1)(C).  (*Id*. at pp. 5-16.)

Finally, Defendants ask the Court to issue a protective order that they need not comply with the administrative subpoenas.  (Doc. No. 106.)  In support of this request, Defendants assert that "governing case law and Department of Justice internal guidance provide that administrative subpoenas may be not directed to criminal defendants" post-indictment.  (*Id*.)  Defendants further maintain that enforcing the administrative subpoenas against them would violate their Fifth Amendment rights.  (*Id*. at pp. 8-9.)

Thereafter, the United States filed a Motion to Enforce Administrative Subpoenas against the Corporate Entities; i.e., Ashis K. Rakhit, M.D., Inc. and Ohio Cardiology Associates, Inc.  (Doc. No. 110.)  Defendants filed a Brief in Opposition in which they argue that the Court should not enforce a post-indictment administrative subpoena to a corporation that is wholly-owned by a criminal defendant.  (Doc. No. 117.)  Defendants maintain that such subpoenas "run against" Rakhit and Gupta and would clearly violate their Fifth Amendment rights.  (*Id*.)  Lastly, Defendants argue that the United States failed to serve its Motion on the Corporate Entities.  (*Id*.)   The United States filed a reply on September 2, 2020.  (Doc. No. 118.)

## II.    Analysis

### A.    Motion to Compel Compliance with Rule 16(b) (Doc. No. 103)

In its Motion to Compel, the United States argues that Defendants failed to satisfy either (1) their reciprocal discovery obligations under Rule 16(b)(1)(A); or (2) the minimum notice requirements under Rule 16(b)(1)(C) regarding expert witness summaries.  (Doc. No. 103.)  The Court will address each of these arguments in turn, below.

8

### 1.    Reciprocal Discovery Obligation under Rule 16(b)(1)(A)

The United States argues that Defendants' delayed disclosure of C.D.'s and R.N.'s medical records violates their reciprocal discovery obligations under Rule 16(b)(1)(A). (Doc. No. 103 at pp. 3-7.) The United States notes that Defendants only recently made their first reciprocal discovery production on June 3, 2020, during which they produced 506 pages of medical records for C.D. and 143 pages of medical records for R.N. (for a total of 647 pages). (*Id.* at pp. 3-4.) The United States indicates that, when they previously seized the patient charts for these two patients, C.D.'s file only contained 281 pages, R.N.'s file only included 41 pages, and neither file contained any clinical notes. (*Id.* at p. 4.) The United States argues that Defendants' recent production contains a host of patient records for C.D. and R.N. from the relevant time period that were not previously located by the Government or disclosed by Defendants. (*Id.*)

The United States maintains that Defendants "failed to explain why they waited until now to disclose [these records] pursuant to their Crim. R. 16(b) reciprocal discovery obligation" and, further, that the delay was prejudicial and "appears to be" intentional. (*Id.* at pp. 5-7.) In particular, the United States argues that Defendants' allegedly late disclosure potentially affects the reports of Government experts, Dr. Biederman and Ms. Kunzi. (*Id.*) In addition, the United States asserts that it now needs to "determine whether any of the [new] documentation requires additional experts and/or witness interviews." (*Id.* at p. 6.)

Defendants argue that they have fully complied with their reciprocal discovery obligations under Rule 16(b). (Doc. No. 105 at pp. 2-4.) They assert that, under Rule 16(b)(1)(A), they need not disclose all potentially relevant information; rather, they are required only to disclose evidence that they intend to use in their case-in-chief at trial. (*Id.*) Defendants maintain that "the government

9

identifies no authority that requires a defendant months before trial to identify his trial evidence." (*Id.*)  Lastly, Defendants argue that the United States has failed to show prejudice given that Defendants "produced these records well over three months before trial." (*Id.*)

In response, the United States argues that "[i]n a case this complex, it is simply gamesmanship for the defense to suggest that as long as they comply before trial it is sufficient." (Doc. No. 108 at p. 2.)  At a minimum, the United States asks that the Court order Defendants to immediately disclose any patient files "not already in the government's possession and no later than 30 days before trial." (*Id.*)

Federal Rule of Criminal Procedure 16(b)(1(A) provides as follows:

> **(A) Documents and Objects**. If a defendant requests disclosure under Rule 16(a)(1)(E) and the government complies, then the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if:
>
> (i) the item is within the defendant's possession, custody, or control; **and**
>
> (ii) **the defendant intends to use the item in the defendant's case-in-chief at trial.**

Fed. R. Civ. P. 16(b)(1)(A) (emphasis added).  Rule 16(d)(2) then sets forth the actions a court may take for violations of this Rule, as follows:

> **(2) Failure to Comply**. If a party fails to comply with this rule, the court may:
>
> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> (B) grant a continuance;
>
> (C) prohibit that party from introducing the undisclosed evidence; or
>
> (D) enter any other order that is just under the circumstances.

Fed. R. Civ. P. 16(d)(2).

As the Sixth Circuit has explained, "[i]t is well settled that a district court has considerable discretion under Rule 16, and that its imposition of a remedy or sanction for a discovery violation will be reviewed under an abuse of discretion standard."  *United States v. Maples*, 60 F.3d 244, 246 (6th Cir. 1995) (citing *United States v. Muhammad*, 948 F.2d 1449, 1454–55 (6th Cir.1991)).  As a general rule, district courts should adopt the "least severe sanction necessary."  *See United States v. Ganier*, 468 F.3d 920, 927 (6th Cir.2006) (observing that district courts should adopt the "least severe sanction necessary doctrine" and utilize suppression as a "remedial device" limited to appropriate circumstances) (quoting *Maples*, 60 F.3d at 247–48).[1]

Here, the parties do not dispute that Defendants requested disclosure from the Government under Rule 16(a)(1)(E) and that the Government complied with this request.  Thus, pursuant to the reciprocal discovery obligations set forth in Rule 16(b)(1)(A), Defendants are required to disclose evidence to the Government if (1) that evidence is within the Defendants' possession, custody, or control, *and* (2) Defendants intend to use the evidence in their case-in-chief at trial.  Defendants argue that their June 3, 2020 disclosure of C.D.'s and R.N.'s medical records, does not violate this Rule because it was only then that Defendants determined that they intended to use these records in their case-in-chief at trial.  (Doc. No. 105 at p. 4.)

---

[1] "Exclusion of evidence is the most serious and least favored of" the remedies set forth in Rule 16(d)(2).  *United States v. Stone*, 218 Fed. Appx. 425, 435 (6th Cir. 2007).  The Sixth Circuit has detailed a series of factors to be considered in determining whether suppression is an appropriate response to a Rule 16 violation: (1) the reasons for any delay in producing materials, including ill intent or bad faith; (2) the degree of prejudice, if any, to the defendant; and (3) whether any prejudice may be cured with a less severe course of action like a continuance or a recess. *Maples,* 60 F.3d at 247. *See also Stone*, 218 Fed. Appx. at 435.

The Court agrees with Defendants. On its face, the disclosure obligations set forth in Rule 16(b)(1)(A) only apply to evidence that a defendant intends to use during his or her case-in-chief at trial. *See United States v. Mills*, 2019 WL 2613199 at * 3 (E.D. Mich. June 26, 2019) (discovery sought under Rule 16(b)(1)(A) "could only be disclosed if Wilson intends to use it during his case-in-chief."). Here, Defendants have averred that they promptly disclosed C.D.'s and R.N.'s medical records once Defendants determined that they intended to use them at trial. The United States has not pointed to any evidence to suggest otherwise. Indeed, the only basis for the United States' argument that Defendants violated Rule 16(b)(1)(A) is the length of time between the January 2018 Indictment and Defendants' June 2020 disclosure. The United States does not, however, point to any language in the Rule itself dictating the precise timing of a defendant's reciprocal discovery obligation. Nor does it argue that Defendants violated the provisions of any specific scheduling Orders entered in this matter. Moreover, the United States has not directed this Court's attention to any evidence demonstrating that Defendants deliberately or intentionally withheld the medical records at issue.

To be sure, one of the goals of Rule 16 is to avoid unfair surprise. *See e.g., United States v. Crowder*, 325 F.Supp.3d 131, 136 (D.D.C. 2018) (noting that "the practical intentions behind Rule 16 [are] to avoid unfair surprise and unwarranted delay by providing both the government and the defense with a broad, reciprocal, right to discovery.") *See also* Fed. R. Crim. P. 16, Advisory Committee note to 1974 amendment. Here, however, the United States has not demonstrated that the timing of Defendants' June 2020 disclosure has caused unfair surprise or prejudice. As of the date

of this Opinion,[2] trial is set for January 25, 2021.  *See* Non-Document Order dated July 17, 2020.

Defendants' reciprocal discovery disclosure, therefore, occurred a full six months prior to trial.  Even

assuming the United States may need to provide the newly disclosed documents to Dr. Biederman

and/or Ms. Kunzi, it has not shown that it has insufficient time or opportunity to do so under the

circumstances.  Nor has the United States otherwise pointed to any evidence of prejudice, given the

significant amount of time between Defendants' disclosure and the current trial date.[3]

Nonetheless, in order to ensure timely disclosure and to avoid any further disputes, the Court

will exercise its inherent authority to regulate procedure and discovery in this matter by establishing

a deadline for the Defendants' Rule 16(b)(1)(A) disclosures.  *See e.g., United States v. Catalan*

*Roman*, 376 F.Supp.2d 108, 114-115 (D.P.R. 2005) (noting that "[i]It is well settled that district courts

have inherent power to make and enforce reasonable rules of procedure, including disclosure rules");

*Mills*, 2019 WL 2613199 at * 4 (same).  Specifically, the Court hereby orders that, **by no later than**

**thirty (30) days before trial, Defendants must produce to the United States all documents**

**subject to disclosure under Rule 16(b)(1)(A).  In addition, Defendants are reminded of their**

**continuing obligation to timely supplement their reciprocal discovery disclosures pursuant to**

---

[2] When the United States filed its Motion, trial was scheduled for July 20, 2020.  However, due to restraints imposed by COVID-19 and with the consent of both parties, the trial date was changed to January 25, 2021.  *See* Non-Document Order dated July 17, 2020.

[3] For this reason, the cases cited by the United States are distinguishable.  *See United States of Hardy*, 586 F.3d 1040 (6th Cir. 2009) (affirming exclusion of evidence where defendant "willfully and purposefully" failed to disclose it until the day of trial); *United States v. Gibson*, 1994 WL 637689 (6th Cir. Nov. 10, 1994) (affirming exclusion of evidence where defendant failed to disclose it until the fourth day of trial).

Rule 16(c).[4] Failure to comply with the above Order may result in the imposition of sanctions, including the exclusion of evidence that is not timely disclosed.

### 2.    Expert Disclosure Obligations under Rule 16(b)(1)(C)

The United States next argues that the Defendants' expert reports are deficient under Fed. R. Crim. P. 16(b)(1)(C) because they fail to contain either an adequate summary of, or the bases for, their experts' opinions.  (Doc. No. 103 at pp. 14-20.)  The United States then discusses each of the Defendants' expert reports individually and, for each one, identifies particular information that the Defendants allegedly improperly failed to provide.  (*Id*.)  The Government asks the Court to "order the Defendants to provide the required detail" and, further, "to order immediate production of any additional expert reports upon which Defendants intend to rely."  (*Id*.  at p. 14.)

Defendants argue that they have more than satisfied the "minimal notice requirements" for each of their expert summaries under Rule 16(b)(1)(C).  (Doc. No. 105 at pp. 5-18.)  Thus, they assert the Court need not, and should not, require them to supplement their expert reports with additional detail.  (*Id*.)  Defendants further argue that, rather than requiring immediate production of all expert summaries, the Court should "order that all expert summaries, including any supplements to any current summary, be disclosed no later than 30 days before trial."  (*Id.* at p. 18.)

Federal Rule of Criminal Procedure 16(b)(1)(C) provides, in relevant part, as follows:

> The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if—

---

[4] Fed. R. Crim. P. 16(c) provides that:  "A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if:  (1) the evidence or material is subject to discovery or inspection under this rule; and (2) the other party previously requested, or the court ordered, its production."

14

> (i) the defendant requests disclosure under subdivision (a)(1)(G) and the government complies;
>
> ***
>
> This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C).   As the Advisory Committee Notes for Rule 16 explain, disclosure is required under this Rule "to minimize surprise that often results from unexpected expert testimony ... and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note (1993). *See also United States v. White,* 492 F.3d 380, 486 (6th Cir. 2007).

The Sixth Circuit has held that, to satisfy this Rule, it is not sufficient for an expert summary to simply list general subject matters about which the expert intends to testify, but fail to "identify what opinion the expert would offer on those subjects." *White,* 492 F.3d at 407. *See United States v. Anderson-Bagshaw*, 509 Fed. Appx. 396, 410 (6th Cir. 2012) (finding expert summary deficient because it failed to adequately identify the opinions held by the expert). *See also United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics. The . . . notice provided a list of the general subject matters to be covered but did not identify what opinion the expert would offer on those subjects.").   Additionally, the Sixth Circuit has affirmed the exclusion of expert testimony where the expert summary provided an "extremely vague" description of the bases of the opinion. *See. Anderson-Bagshaw*, 509 Fed. Appx. at 411 (affirming exclusion of expert testimony where defendant's expert "listed not a single test that Dr. McPherson performed, much less the specific conclusions reached from each test. Not until trial did the government learn which tests Dr. McPherson had performed. Without at least a list of the tests,

15

the government could not have adequately prepared to cross examine her.")  *See also United States v. Davis*, 514 F.3d 596, 613 (6th Cir. 2008) (finding that expert summary failed to adequately indicate bases of opinion because "if Davis had hired a chemist, he or she would not have been able to analyze the steps that led the government's chemists to their conclusions.")

While the type of information that must be disclosed under Rule 16(b)(1)(C) is clear, "[t]he *quantity* and *specificity* required of the disclosure ... is less so." *United States v. Mehta*, 236 F. Supp.2d 150, 155 (D. Mass. 2002) (emphasis in original).  *See also United States v. Tuzman*, 2017 WL 6527261 at * 10 (E.D. N.Y. Dec. 18, 2017).  Nonetheless, where a defendant's disclosure makes "no attempt at all to describe 'the bases and reasons'" for an expert's opinion, then the disclosure is deficient under Rule 16(b)(1)(C).  *United States v. Wilson*, 493 F. Supp. 2d 484, 487 (E.D.N.Y. 2007). *See also Tuzman*, 2017 WL 6527261 at * 10.  Moreover, a "general description of possible bases does not meet the requirements of Rule 16(b)(1)(C)."  *United States v. Sturman*, 1998 WL 126066 at *1 (S.D.N.Y. Mar. 20, 1998).

Courts have also noted that "complex testimony will require more substantial disclosures." *United States v. Ferguson*, 2007 WL 4539646 at *2 (D. Conn. Dec. 14, 2007) (citing *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995)).  *See also Jackson,* 51 F.3d at 651 (indicating that Rule 16(a)(1)(E)—which requires the Government to supply the "bases and reasons" underlying its proposed expert testimony—"may require greater disclosure" in "cases involving technical or scientific evidence"); *United States v. Wilkerson*, 189 F.R.D. 14, 16 (D. Mass. 1999) (under Rule 16(a)(1)(E), "the extent of detail required ... will depend on the nature of the expert testimony"); *Tuzman,* 2017 WL 6527261 at * 11 (same).

16

With the above principles in mind, the Court now examines the parties' arguments with respect to each of Defendants' expert summaries.

### a.      Dr. Charash

On February 10, 2020, Defendants disclosed the expert summary of cardiologist Bruce D. Charash, M.D., F.A.C.C.  (Doc. No. 103-5.)  As detailed in his summary, Dr. Charash reviewed the "office charts" of nineteen patients "to evaluate the[ir] care and treatment" by Defendants.  (*Id*. at p. 3.)  These nineteen patients are specifically identified by name, and then individually discussed over the course of Dr. Charash's thirty-one page, single spaced report.  (*Id*. at pp. 6-31.)  When discussing these patients, Dr. Charash references specific office visits, tests, procedures, and examinations, by date.  (*Id.*)  With respect to each patient, Dr. Charash opines that the testing ordered by Defendants conformed to the current standard of care and reflected good clinical judgment.  (*Id*. at pp. 4, 5, 8-31.)

The United States does not argue that Dr. Charash failed to adequately summarize his opinions.  Rather, the United States asserts that "[g]iven the June 3, 2020 defense disclosures of additional records for patients [R.N]. and [C.D.]," Defendants should be ordered to "specify what records Dr. Charash reviewed."  (Doc. No. 103 at p. 14.)  At a minimum, the United States asserts, Defendants should be required to "clarify whether Dr. Charash had the same 'office charts' that Dr. Biederman reviewed or whether they provided additional 'office charts' to Dr. Charash and if so, identify and/or disclose those additional records."  (*Id*.)  In particular, the United States maintains that they are entitled to know whether Dr. Charash reviewed the newly disclosed office records contained in Defendants' June 3, 2020 reciprocal discovery disclosure, or "any additional records not disclosed to the government."  (Doc. No. 108 at p. 10.)

17

Defendants argue that Dr. Charash's summary adequately describes the bases for his opinions, including the documents he reviewed.  (Doc. No. 105 at p. 7.)

Although Dr. Charash begins his summary by stating generally that he reviewed the "office charts" of the 19 patients, most of his discussions regarding each individual patient reference specific office visits, tests, and procedures by date.  *See, e.g.*, Doc. No. 103-5 at pp. 6-8.  Some, however, do not.  For example, with respect to patient C.D., Dr. Charash's discussion generally references annual "non-invasive vascular studies," but does not indicate the specific studies reviewed or the dates of those studies.  (Doc. No. 103-5 at p. 20.)  Moreover, Dr. Charash states generally that C.D. complained of episodic chest pain and shortness of breath "over this extended period," but does not identify which specific office notes or documents he reviewed to reach this conclusion.  Likewise, with respect to patient L.C., Dr. Charash references the "multiple non-invasive testing" performed on L.C. over a period of years but does not appear to specifically identify each test that he reviewed.  (*Id.* at pp. 28-29.)

Defendants are correct that Rule 16(b)(1)(C) "is not intended to create unreasonable procedural hurdles."  Fed. R. Crim. 16 advisory committee notes (1993).  However, as noted above, courts have recognized that, where expert testimony involves complex technical or scientific matters and voluminous documentation, greater specificity in disclosure may be required.  *See, e.g., Jackson*, 51 F.3d at 651 (recognizing that "cases involving technical or scientific evidence may require greater disclosure"); *Ferguson*, 2007 WL 4539646 at * 2 (requiring defendants in criminal securities fraud case to disclose additional information relating to expert summaries that "links specific sources to each of the experts' opinions"); *Sturman*, 1998 WL 126066 at * 1 (requiring defendant to disclose

18

additional information relating to expert summary of psychiatrist, including a "specific description" of "what records Dr. Goldstein reviewed.").

Here, Dr. Charash's expert testimony relates to complex medical issues and is based on his review of voluminous patient records.  In order to test the merits of Dr. Charash's opinion, the United States must be more fully apprised of the materials that Dr. Charash relied on and provided sufficient opportunity to share such materials with its own experts.  *See* Fed. R. Crim. P. 16 advisory committee's note (1993) (noting that Rule 16 is intended to provide each side a "fair opportunity to test the merit of the expert's testimony through focused cross-examination.")  Although Dr. Charash does mention some specific records in connection with certain patients, it is not clear that his summary identifies all the records that Dr. Charash relied on in reaching his conclusions.

In light of the complexity of the medical issues raised in this matter, as well as both parties' extensive reliance on expert testimony, the Court finds that Defendants must provide additional information regarding the documents that Dr. Charash relied on in preparing his expert summary. Specifically, Defendants must clarify whether Dr. Charash relied on the same 'office charts' that Dr. Biederman reviewed or whether he relied on any additional 'office charts' not identified in Dr. Biederman's report.  If Dr. Charash did rely on additional "office charts" not identified in Dr. Biederman's report, Defendants must identify and disclose those additional records to the United States.  In order to provide the United States sufficient opportunity to evaluate this information before trial, Defendants are ordered to comply within thirty (30) days of the date of this Order.

### b.    Dr. Miser

Defendants disclosed the expert summary of family physician William F. Miser, M.D., in February 2020.  (Doc. No. 103-8.)  As explained in his summary, Dr. Miser was asked to review

Defendants' controlled substances prescriptions to thirteen specific patients during the time period 2014-2018, "in the context of a Primary Care Physician." (*Id.* at p. 3.)  Dr. Miser identified the materials he reviewed as: (1) the "medical records and office notes of Drs. Ashis Rakhit and Jayati Gupta Rakhit," regarding the 13 patients; and (2) the June 24, 2019 report of government expert, Milton Landers, M.D.  (*Id.*)

In the first paragraph of his summary, Dr. Miser discusses general guidelines published by the Centers for Disease Control ("CDC") in March 2016 that "provide recommendations for primary care clinicians who are prescribing opioids for chronic pain outside of active cancer treatment, palliative care, and end of life care." (*Id.*)  The remainder of his summary consists of the following:

> The determination of whether it is appropriate to prescribe controlled substances to a patient is a multi-factorial process that heavily relies upon the individual clinician's clinical assessment and judgment. Although not exhaustive to determine whether the prescribing of controlled substances meets the standard of care and was for a legitimate medical purpose in the course of practice, it is my opinion, at a minimum, the below issues must be analyzed:
>
> 1. Did the patient present a history consistent with pain?;
>
> 2. Does the chart document an anatomical basis of the pain consistent with the medical history?;
>
> 3. Was there a review of the Ohio Automated Reporting Rx System (OARRS)?;
>
> 4. Were the medications started at the lowest effective dose?;
>
> 5. Were the medications initially prescribed with a reasonable number of pills?;
>
> 6. Did the physician require frequent follow-up visits for monitoring before additional medications were prescribed?; and
>
> 7. Was there compliance with the minimum morphine equivalent of daily dosages?

20

An important role of a primary care physician is to provide appropriate treatment to patients that experience pain, as patients are entitled to have their pain medically managed.

**Summary of Findings and Opinions**

Based upon my education, training, and experience as a practicing family physician, certified by the American Board of Family Medicine, and my detailed review of the medical records set forth herein, **it is my opinion, to a reasonable degree of medical certainty, that the controlled substance prescriptions written by Dr. Ashis Rakhit and Dr. Jayati Gupta Rakhit on patients listed Nos. 1-13 were appropriate, met the standard of care and were for a legitimate medical purpose in the usual course of medical practice.**

*Id.* at p. 4 (emphasis added).

The United States argues that Dr. Miser's summary is deficient in several respects.  First, the United States argues that Defendants failed to sufficiently identify the documents that Dr. Miser relied on in conducting his review.  The Government "asks the Court to order the defense to specify by bates number what records Dr. Miser reviewed."  (Doc. No. 103 at p. 16.)  The United States asserts that, "[a]t a minimum, the defense should clarify whether Dr. Miser had the same 'office charts' that [government expert] Dr. Landers reviewed, or whether they provided additional 'office charts' to Dr. Miser (and, if so, identify and/or disclose those additional records)."  (*Id.*)  Second, the United States argues that the Court should order the defense to disclose Dr. Miser's "detailed review."  (*Id.* at p. 16.)  The Government argues that, "the defense should disclose the reasons underlying his summary conclusion that all controlled substance prescriptions for 13 patients 'met the standard of care,' including Dr. Miser's analysis of the 'seven questions' for each of the prescriptions upon which his conclusion is based."  (*Id.*)

Defendants argue that the Government's Motion demands far more detail than what is required under Rule 16.  (Doc. No. 105 at pp. 8-9.)  They assert that there is no legal authority to

21

support the United States' request that the defense identify all documents reviewed by Dr. Miser by bates number. (*Id.*)  Next, Defendants argue that Dr. Miser's summary fully complies with Rule 16(b)(1)(C) because it "provides more than a list of general topics that he will testify about," and instead, "explains his opinions (that the prescriptions the Rakhits issued were for legitimate medical purposes) and the reasons for those opinions (his education, his experience, the records he reviewed, and the literature that he reviewed.)."  (*Id.* at p. 10.)

The Court agrees with the United States that Dr. Miser's summary is deficient.  First, the Court finds that Defendants failed to sufficiently identify the documents Dr. Miser relied on in reaching his conclusions.  Unlike many of Defendants' experts, Dr. Miser does not identify any specific office notes or other medical records (by date or otherwise) in his summary.  (Doc. No. 103-8.)  Rather, Dr. Miser simply states that he reviewed Defendants' "medical records and office notes" relating to the 13 identified patients, as well as the report of the Government's pain management physician, Dr. Landers.  Dr. Miser's generic reference to "medical records and office notices" is vague and fails to provide adequate notice to the Government regarding the materials he relied on in reaching his conclusions.

The Court therefore finds that additional information is required, particularly in light of the complexity of the issues and the volume of records involved.  Specifically, Defendants must clarify whether Dr. Miser relied on the same "office charts" that Dr. Landers reviewed or whether he relied on any additional "office charts" not identified in Dr. Landers' report.  If Dr. Miser did rely on additional "office charts" not identified in Dr. Landers' report, Defendants must identify and disclose those additional records to the United States.  In order to provide the United States sufficient

22

opportunity to evaluate this information before trial, Defendants are ordered to comply within thirty (30) days of the date of this Order.

Second, the Court finds that Defendants failed to sufficiently disclose the bases for Dr. Miser's opinion that Defendants' prescriptions "were appropriate, met the standard of care, and were for a legitimate medical purpose."  (Doc. No. 103-8 at p. 4.)  As discussed *supra*, to comply with Rule 16, an expert report must provide the substance of the expert's "actual opinions."  *Ferguson*, 2007 WL 4539646 at *1.  *See also United States v. Ahmed*, 2015 WL 1611947 at *1 (E.D.N.Y. Apr. 9, 2015); *United States v. Ulbricht*, 2015 WL 413318 at *5 (S.D.N.Y. Feb. 1, 2015).  Thus, courts have held that an expert's testimony "may be excluded if the [proponent] has made no attempt at all to describe the bases and reasons for those opinions" in its disclosure.  *United States v. Mavashev*, 2010 WL 234773 at *2 (E.D.N.Y. Jan. 14, 2010) (emphasis in original) (quoting *United States v. Mahaffy*, 2007 WL 1213738 at *2 (E.D.N.Y. Apr. 24, 2007)).  *See also United States v. Baker*, 2016 WL 7176588 at * 1 (E.D.N.Y. Dec. 8, 2016).

Here, although Dr. Miser recites the CDC guidelines and the seven factors relevant to a standard of care analysis, he does not explain the reasons why he believes that Defendants' prescriptions satisfy these guidelines and factors.  Nor does Dr. Miser identify or explain his reasons for finding the standard of care met with respect to any of the specific 13 patients identified in his summary.  In other words, while Dr. Miser indicates the sources that he relied on, he fails to indicate the bases or reasons for his opinions, with respect to any of the 13 identified patients.  The single sentence about Dr Miser's overall conclusions is insufficient.[5]  *See, e.g., Ahmed*, 2015 WL 1611947

---

[5] Defendants cite several cases in which a short summary of an expert's opinion was deemed sufficient.  The Court finds these cases to be distinguishable.  In *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995), the court upheld a government disclosure that an expert would testify about a "drug courier profile" that included beepers, firearms, walkie-

at *2  (ordering supplementation of expert disclosure where "[t]h[e] disclosure does not indicate, among other things, (1) the reasons why the experts think Mr. Lindh's methodology is unsound or not reliable, (2) the bases for their conclusion that Mr. Lindh's analysis is not based on sufficient facts, or (3) the reasons why they believe that Mr. Lindh did not correctly apply principles or methods to the facts of this case.").

Accordingly, within 30 days of the date of this Order, Defendants are ordered to supplement Dr. Miser's summary.  In addition to clarifying and, if necessary, identifying and disclosing the documents that Dr. Miser relied on as set forth *supra*, Defendants must provide a more detailed explanation of the underlying reasons for Dr. Miser's opinions that Defendants' prescriptions "were appropriate, met the standard of care, and were for a legitimate medical purpose"  with respect to each of the 13 patients identified in Dr. Miser's summary.  (Doc. No. 103-8 at p. 4.)

### c.    Dr. Langer

In June 2020, Defendants disclosed the expert report of nuclear cardiologist Michael Langer, M.D.  (Doc. No. 103-9.)  Therein, Dr. Langer states that he performed a "blind read" of 17 Nuclear Stress Tests ("NSTs") that were previously interpreted by Defendant Gupta.  (*Id*. at p. 1.)  The 17

---

talkies, and Western Union wire transfers.  The court found that "the summary provided the defendants with both the grounds and the background for the testimony, enabling them to prepare for cross-examination." *Id.* at 651.  However, the court expressly noted that "other contexts, such as cases involving technical or scientific evidence, may require greater disclosure." *Id.*  This is just such a case. As noted above, the instant case involves expert testimony regarding complex medical and scientific issues.  Given this context, Dr. Miser's summary fails to provide sufficient detail to allow the government to adequately prepare for cross-examination.  Defendants' reliance on *United States v. Conroy*, 424 F.3d 833 (8th Cir. 2005) is also misplaced. There, unlike here, the government's expert disclosure (although brief) did provide several reasons for the expert's underlying conclusion that no semen was found on a rug.  *Id*. at 838.  More importantly, in *Conroy*, the court noted that (1) the defense had failed to move to compel a more detailed notice before trial; and (2) a more detailed notice would not have helped the defense anyway and actually was consistent with the defense theory of the case that there was no semen on the rug.  *Id*. Here, by contrast, the United States is moving to compel a more detailed notice before trial and, clearly, the Defendants' proposed expert testimony would help their defense.  Accordingly, *Conroy* is also distinguishable from the instant case.

NST images are specifically identified in Dr. Langer's summary by both patient name and date. (*Id.* at pp. 2-5.) For each study, Dr. Langer compares his reading of the NST image with Defendant Gupta's reading, and explains the bases for any differences in interpretation. (*Id.*) Dr. Langer concludes, in relevant part, as follows:

> In my review of the 17 cases I agreed with 88% of Dr. Gupta Rakhit's interpretations as normal verses abnormal. This is reasonable and expected variation between two separate readers.
>
> Pursuant to my review, I conclude within a reasonable degree of medical certainty that the totality of the interpretations by Dr. Gupta Rakhit was consistent with national standards in the interpretation of this type of study. The variations between interpretations between these studies was also consistent with interobserver interpretation differences. It is my opinion that the totality of the interpretations of the reviewed tests by Dr. Gupta Rakhit demonstrate that her interpretations were for a legitimate medical purpose in the usual course of one's medical practice in reading and interpreting Nuclear Stress Tests.

(*Id.* at pp. 5-6.)

In their Motion, the United States "does not contest, for the most part, the Rule 16 adequacy of Dr. Langer's report." (Doc. No. 103 at p. 16.) However, "out of an abundance of caution," the United States asks the Court to order Defendants to confirm that Dr. Langer only considered the 17 specific NST images (and Defendant Gupta's interpretative reports for those images) identified in his summary. (*Id.*) In addition, the United States notes that, in his summary, Dr. Langer specifically discusses the June 2016 NST image for S.F. and the June 2015 image for S.S. (*Id.* at p. 17.) Because the United States does not have the S.F. NST image and does not have a readable version of the S.S. NST image, it requests that Defendants be ordered to disclose these images immediately. (*Id.*)

Defendants argue that Dr. Langer's summary adequately identifies the records he reviewed and nothing further is required. (Doc. No. 105 at p. 10-11.) With regard to the S.F. and S.S. NST images, Defendants argue that they should not be required to produce these images because they are

already in the Government's possession.  (*Id*.)  In response to the United States' argument that they do not have a readable version of the S.S. NST image, Defendants assert that "that is not the Rakhits' concern."  (*Id*. at p. 11.)

The Court agrees with the United States.  Defendants are ordered to confirm that the only medical records that Dr. Langer relied on in preparing his June 2020 summary are the (1) the 17 specific NST images identified therein, and (2) Defendant Gupta's interpretative reports for those same images.  If Dr. Langer relied on any additional patient records, Defendants are required to disclose those records to the United States.  Defendants must comply with the above within 30 days of the date of this Order.

In addition, and also within 30 days of the date of this Order, Defendants are ordered to produce readable images of the S.F. June 2016 NST image and the S.S. June 2015 NST image to the United States.  Dr. Langer relied on both of these images in his expert report and they are, therefore, subject to disclosure.  The United States expressly states that it does not have a June 15, 2016 NST image for S.F. in its possession.  *See* Doc. No. 108 at p. 13 ("Defendants respond that the government has this image, but as we have said, we do not have this image at all.")  Defendants are ordered to produce this image to the United States as soon as possible, and by no later than 30 days from the date of this Order.

With regard to the S.S. June 2015 NST image, the United States states that it "seized a CD that listed that image, but the image was corrupted and Dr. Biederman was unable to read it."  (Doc. No. 108 at p. 13.)  As both parties are well aware, earlier in this case and upon motion of the Defendants, this Court went to great lengths to ensure that Defendants were able to obtain readable images of several NST images in the Government's possession, including going so far as to direct the

United States to bring the necessary machinery to the offices of defense counsel so that Defendants' expert could view the images.  *See* Non-Document Order dated May 12, 2020.  In light of this history, Defendants' refusal to provide a readable version of the S.S. June 2015 NST images to the Government is troubling.

The Court will provide the same protections to the United States as it did to Defendants. Accordingly, Defendants must produce a readable version of the S.S. June 2015 NST image as soon as practicable, and by no later than 30 days of the date of this Order.

### d.    Dr. Marmur

In February 2020, Defendants disclosed the summary of interventional cardiologist Johnathan Marmur, M.D.  (Doc. No. 103-10.)  Therein, Dr. Marmur states that he "reviewed the cardiac catheterization data and reports" of nine specific patients, who are identified in the summary by name. (*Id.*)  For each patient, Dr. Marmur identifies the specific "films" he reviewed by date, and then discusses his evaluation of those films and unidentified "reports" relating thereto.  (*Id.*)  After conducting this evaluation, Dr. Marmur offers his overall opinion as follows:

> In summary, the films are reported to a reasonable degree of accuracy. The discrepancies noted above are within the standard of care, which must take into account the well reported phenomenon of inter-observer variability (Interobserver variability in coronary angiography. Zir LM, Miller SW, Dinsmore RE, et al. Circulation. 1976; 53:627– 632). There was no angiographic evidence of inappropriate coronary stenting, and in one case, stenting was avoided by treating the vessel with IC NTG. Finally, the operative techniques, both diagnostic and interventional, appeared to be appropriate and within the standard of care.

(*Id.* at p. 4.)

The United States argues that supplementation is required because Defendants fail to specify "what data and reports" Dr. Marmur relied on in reaching his conclusions.  (Doc. No. 103 at p. 18.) Specifically, the United States argues that "the Court should order the defense to disclose more

specifically what Dr. Marmur reviewed;" i.e., "did the defense provide to Dr. Marmur the full hospital record for each patient? Did they provide the Defendants' patient records?" [6] (*Id*.)

In response, Defendants argue that no supplementation is required because Dr. Marmur's summary "already states that he reviewed the cardiac catheterization data and the reports for nine patients and his summary lists the cardiac catheterization films that he reviewed."  (Doc. No. 105 at p. 12.)  Defendants complain that it is "entirely unclear what more the government wants the Rakhits to disclose."  (*Id*.)

The Court agrees with the United States that Defendants failed to sufficiently identify the documents that Dr. Marmur relied on in reaching his conclusions.   Although Dr. Marmur identifies specific "films" that he reviewed for each of the nine identified patients, he also generally references "reports" without identifying the specific reports that he relied on.  Dr. Marmur's generic reference to unidentified "reports" is vague and fails to provide adequate notice to the Government regarding the materials he relied on in reaching his conclusions.  Thus, and for the same reasons discussed in connection with Dr. Miser's report, the Court finds this to be insufficient.

Accordingly, within 30 days of the date of this Order, Defendants are ordered to identify the specific documents that Dr. Marmur relied on in preparing his February 2020 expert summary.  If any of the documents relied on by Dr. Marmur have not previously been disclosed to the United States, Defendants are ordered to disclose said documents to the United States, also within 30 days of the date of this Order.

------

[6] The United States also complains that Defendants failed to disclose Dr. Marmur's C.V.  (Doc. No. 103 at p. 18.)  In their Brief in Opposition, Defendants state that they have since provided the Government with Dr. Marmur's C.V. and this particular issue is now moot. (Doc. No. 105 at p. 12.)  The United States agrees the C.V. has been produced and the issue is moot.  (Doc. No. 108 at p. 15.)

### e.    Dr. Ross

In March 2020, Defendants disclosed the report of pain management physician Edgar Ross, M.D.  (Doc. No. 103-11.)  Therein, Dr. Ross states that he reviewed Defendants' "medical records and office notes" regarding thirteen specific patients, as well as the expert report of the United States' expert Dr. Landers.  (*Id*. at p.1.)  Dr. Ross first explains the alleged deficiencies in Dr. Landers' report regarding Defendants' controlled substances prescriptions.  (*Id*. at p. 3.)  He then discusses each of the thirteen identified patients individually, for each one evaluating whether Defendants appropriately prescribed controlled substances for a legitimate medical purpose.  (*Id*. at pp. 4-6.)

In April 2020, Dr. Ross submitted a one-page supplementation, which provides (in its entirety) as follows:

> It has been my experience over the many years I have been actively treating pain patients that the medical records I have received from primary care doctors that the documentation found in medical records [sic] have often been lacking in the details that a pain specialist would include. This is especially true in the time frame that the patient documentation referenced in the above case and the years the patients where [sic] seen. Electronic medical records (EMR) systems now common place have improved documentation because of the prompting capabilities that are integrated into these systems. Because of this, paper-based records commonly have much less detail than EMR based systems.

> As part of my teaching responsibilities at our Harvard based pain fellowship program, compliant medical record documentation and billing is part of the curriculum. In my review of the medical records associated with the above case I am struck by the complexity including the significant number of comorbid health problems that these patients presented with. It should be noted that the medical documentation requirements have several options to support billing beyond the usual elements such as family history (FH), past medical history (PMH), review of systems (ROS) and social history (SH). Other areas that can be used to support the level of billing that go beyond this include the time needed to review of labs, coordinate care, counseling of patients and the time needed to schedule and interpret tests. When evaluating the coding levels, time spent taking care of patients must also include the complexity of a patient supporting medical necessity.

> All my opinions are held within medical certainty.

29

(Doc. No. 103-12.)

With regard to Dr. Ross' March 2020 report, the United States argues that Defendants should be ordered to "specify by bates number what records Dr. Ross reviewed."  (Doc. No. 103 at p. 18.) The Court agrees.  Dr. Ross does not identify any specific office notes or medical records (by date or otherwise) in his summary.  (Doc. No. 103-11.)  Rather, Dr. Ross simply states that he reviewed Defendants' "medical records and office notes" relating to the 13 identified patients, as well as the report of Dr. Landers.  Dr. Ross's generic reference to "medical records and office notices" is vague and fails to provide adequate notice to the Government regarding the materials he relied on in reaching his conclusions.  As it did with Dr. Miser and Dr. Marmur, the Court finds that additional information is required, particularly in light of the complexity of the issues and the volume of records involved

Accordingly, within 30 days of the date of this Order, Defendants are ordered to identify the specific documents that Dr. Ross relied on in preparing his March 2020 expert summary.  If any of the documents relied on by Dr. Ross have not previously been disclosed to the United States, Defendants are ordered to disclose said documents to the United States, also within 30 days of the date of this Order.

With regard to Dr. Ross' April 2020 supplementation, the United States argues that "[i]f the defense intends to offer Dr. Ross as a medical coding expert, then the Court should order disclosure of his qualifications in that subject."  (Doc. No. 103 at p. 19.)  If the defense intends to offer Dr. Ross as an expert on the bills submitted by Defendants, the United States asserts that "the Court should order the Defendants to supplement Dr. Ross's summary with the reasons for his apparent conclusion that the Defendants' billing is justified by the patients' medical complexity."  (*Id.*)

In response, Defendants first state (without further elaboration) that Dr. Ross' 42-page CV supplies his qualifications regarding coding. While Dr. Ross undoubtedly has an impressive resume, it is not this Court's function to scour through all of his many positions, editorial activities, professional societies, honors and prizes, funding information, presentations, practice activities, and publications to determine which may support his qualifications as a coding expert. (Doc. No. 105-4.) Defendants had every opportunity to elaborate on this in their Brief in Opposition but failed to do so. Thus, the Court grants the United States' request and orders Defendants to specifically disclose Dr. Ross' qualifications to serve as an expert on the topic of coding, within 30 days of the date of this Order.

With regard to Dr. Ross' apparent conclusion that Defendants' billing is justified, Defendants offer no meaningful response to the United States' argument, other than to state that Dr. Ross' supplementation satisfies the Rule 16's "minimal notice requirements." (Doc. No. 105 at p. 14.) The Court disagrees and finds Dr. Ross' supplementation to be wholly insufficient with regard to any opinions he may have regarding Defendants' coding and/or billing practices. As an initial matter, it is not entirely clear what Dr. Ross' opinion actually is with regard to these topics. Defendants appear to believe that Dr. Ross' supplementation expresses his opinion that Defendants' billing practices were justified. If that is the case and Defendants intend to call Dr. Ross to testify regarding this issue, Defendants are ordered to supplement Dr. Ross to (1) clearly articulate his opinions regarding Defendants' coding and/or billing practices; (2) specifically identify the documents he relied on in reaching his opinions; and (3) sufficiently explain the reasons for his opinions with respect to each of the 13 patients identified in his March 2020 report. Defendants are ordered to do so within 30 days of the date of this Order.

f.      **Dr. Sharma**

In June 2020, Defendants disclosed the expert summary of cardiologist Samin K. Sharma, M.D.  (Doc. No. 103-13.)  Therein, Dr. Sharma states that he "reviewed the cardiac catheterization films and corresponding interpretive reports generated from the catheterizations performed by" Defendants with respect to nine patients, each of whom is identified by name.  (*Id.*)  Each patient's catheterization film(s) are specifically identified by date.  (*Id.*)  Dr. Sharma first opines as follows:

> I reviewed each of the Cardiac Catheterization cd's prior to reading the procedure report generated by Dr.  Ashis K.  Rakhit and/or Jayati G.  Rakhit.  In all instances, the reports accurately described the findings of the cardiac catheterizations.  It should be noted that interpretation of angiographic diameter stenosis by different operators can vary by 10-20% and therefore stenosis severity is often reported in a range example 70-80% diameter stenosis.  In no instance, in my review of the coronary angiograms did my read of the coronary angiograms differ from the read by Dr. Ashis K. Rakhit and/or Dr. Jayati G. Rakhit by more than 10-20% diameter stenosis.  There was no over reading or other inaccuracies in the catheterization, including stenting, interpretative reports.  Further, it is my opinion any interventional treatment that was provided to the patients was appropriate given the degree of stenosis severity was done for a legitimate medical purpose in the ordinary course of medical practice.

(*Id.*)

The United States argues that this disclosure is insufficient because it fails to sufficiently identify either the documents that Dr. Sharma reviewed or the underlying reasoning for Dr. Sharma's opinions.  (Doc. No. 103 at p. 19.)  With respect to the documents, the United States argues that Defendants should be ordered to disclose "more specifically what Dr. Sharma reviewed," i.e., whether he reviewed each patient's full hospital record and/or patient records.  (*Id.*)  With regard to Dr. Sharma's opinions, the United States argues that Defendants should be ordered to disclose (1) what Dr. Sharma's "reading" was for each patient, and (2) the underlying reasons for Dr. Sharma's conclusion that "there was no over reading or other inaccuracies in the catheterization, including the stenting, interpretive reports."  (*Id.*)  In addition, the United States argues that Defendants should be

32

ordered to identify the "interventional treatments" referenced in Dr. Sharma's summary and "provide the underlying reasoning for Dr. Sharma's conclusion that a legitimate medical purpose justified each interventional treatment."  (*Id*. at p. 20.)

Defendants argue that Dr. Sharma's summary adequately identifies the documents he reviewed; i.e., the catheterization films and corresponding interpretive reports.  (Doc. No. 105 at p. 14.)  In addition, Defendants argue that Dr. Sharma's summary sufficiently describes the reasons for his opinions.  (*Id*. at pp. 14-15.)

The Court agrees with the United States.  Defendants are ordered to confirm that the only medical records that Dr. Sharma relied on in preparing his June 2020 summary are the (1) the specific cardiac catheterization films identified therein, and (2) Defendants' "corresponding interpretative reports" for those same images.  If Dr. Sharma relied on any additional hospital and/or patient records, Defendants are required to disclose those records to the United States.  Defendants must comply with the above within 30 days of the date of this Order.

In addition, the Court finds that Defendants failed to sufficiently disclose the bases for Dr. Sharma's opinions that Defendants did not "over read" the catheterizations at issue and that "the interventional treatment that was provided to the patients was appropriate given the degree of stenosis severity [and] was done for a legitimate medical purpose." (Doc. No. 103-13.)  Although Dr. Sharma states generally that his readings did not differ from Defendants' readings by "more than 10-20% diameter stenosis," Defendants fail to disclose what Dr. Sharma's reading was for each of the nine identified patients.  As Defendants themselves note, the Sixth Circuit has explained the potential significance of a 10 to 20% difference in stenosis, as follows:

> If the angiogram shows at least 70% blockage, the accepted standard of medical care allows a doctor to insert a stent with no further testing. A stent is a small mesh cylinder

that props the artery open to increase blood flow. Stents can improve blood flow and help prevent heart attacks, but they cannot cure stenosis or prevent its progression. Moreover, stents are permanent, and the procedure has been known to cause dangerous bleeding or blood clots in some cases. But when a patient's blood vessels are narrowed by 70% or more, the risk of a heart attack or stroke caused by the stenosis is more severe than any risks posed by the stenting procedure.

Cardiologists also consider a blockage between 50% and 70% to be troubling. However, because angiograms are sometimes inconclusive in this range, the medical consensus appears to be that a stent is justified at these levels only if other testing (such as an intra-vascular ultrasound, or IVUS) confirms that the stenosis is dangerous to the patient. If the blockage is less than 50%, then the problem does not typically justify the risks involved in placing a stent.

*United States v. Paulus*, 894 F.3d 267, 271-272 (6th Cir. 2018).  Thus, hypothetically, a reading of 80% stenosis could well result in a very different treatment outcome than a reading of 60% stenosis. In light of the importance of the specific degree of stenosis found, the Court agrees with the United States that Defendants should be required to disclose the degree of stenosis that Dr. Sharma found for each of the nine identified patients.

In addition, and for the reasons discussed in connection with Dr. Miser's summary, the Court finds that Defendants failed to sufficiently disclose the bases for Dr. Sharma's opinions that Defendants did not over read the catheterizations at issue, and that "the interventional treatment that was provided to the patients was appropriate given the degree of stenosis severity [and] was done for a legitimate medical purpose." (Doc. No. 103-13.)  Dr. Sharma's summary does not explain the reasons why he believes that Defendants did not over read the catheterizations of the patients at issue. Nor does he explain why the interventional treatment provided by Defendants was "appropriate" or "done for a legitimate medical purpose" with respect to any of the specific nine patients identified in his summary.  As with Dr. Miser's summary, the single sentence about Dr Sharma's overall conclusions is insufficient.

34

Accordingly, within 30 days of the date of this Order, Defendants are ordered to supplement Dr. Sharma's summary.  In addition to clarifying and, if necessary, identifying and disclosing the documents that Dr. Sharma relied on, Defendants must supplement his disclosure to (1) identify the specific degree of diameter stenosis that he found with respect to each of the nine patients listed in his report; and (2) more fully explain his opinions that (a) Defendants did not over read the catheterizations at issue and (b) "the interventional treatment that was provided to the patients was appropriate given the degree of stenosis severity [and] was done for a legitimate medical purpose."

Lastly, Dr. Sharma offers the following specific opinion regarding a patient who will be identified herein as M.Y.:

> Further, I have had the opportunity to review the August 27, 2015 -August 28, 2015 St. Vincent Charity Hospital medical record for patient, [M.Y.], and her corresponding autopsy  report form the Cuyahoga County' Medical Examiner's Office, the expert report of RN Wendt dated  April 14, 2020,  Dr. Rakhit's office chart and records from 2011-2015 from St Vincent Charity Hospital and Dr. Ian Gilchrist'·s report of August 19, 2019.   Dr. Rakhit's office chart documents on August 7, 2015 [M.Y.]'s chief complaint was shortness of breath on exertion, CAD, DM, hypercholesterolernia, tobacco use.  A Nuclear Stress Test (NST) of August 19, 2015 had findings of medium profusion defect of moderate intensity in the anterior and lateral wall and EF of 56% (Intermediate risk scan).   At the August 22, 2015 office visit, [M.Y.] had intermittent CP and shortness of breath on exertion. [M.Y.] was also taking Toprol XL 100mg 2x per day and Hydrochlorothiazide 25mg once a day (2011-2013 and 2015), per the St. Vincent Charity Medical Center records.
>
> It is my opinion that that the stenting performed on patient, [M.Y.], in the August 28, 2015 catheterization met the standard of care, was medically indicated, [and] was done for a legitimate medical purpose in the ordinary course of medical practice.
>
> Further, it is my opinion that the death of patient, [M.Y.], was unfortunate due to a known vascular complication of intervention.

(Doc. No. 103-13.)

The United States argues that Dr. Sharma's summary of his opinions with respect to M.Y. is insufficient because it fails to disclose his underlying reasoning for his conclusions that her

35

catheterization met the standard of care, was medically indicated, and was done for a legitimate medical purpose in the ordinary course of medical practice. The Court agrees. Accordingly, within 30 days of the date of this Order, Defendants must also supplement Dr. Sharma's disclosure to more fully explain the bases for this conclusion with respect to M.Y.

### g.    Ms. Bloink

In February 2020, Defendants disclosed the expert summary of Jacqueline Bloink regarding Defendants' medical coding and billing documentation practices. (Doc. No. 103-6.) The United States argues that Ms. Bloink's summary is deficient because it "provides absolutely no explanation for her conclusions – she fails to mention even a single patient or a single bill in particular." (Doc. No. 103 at p. 15.) In response, Defendants argue that they are "currently in the process of supplementing Ms. Bloink's summary," and request that the Court deny this portion of the Government's Motion as moot. (Doc. No. 105 at p. 7.) In reply, the United States states that "[g]iven Defendants' proposed interpretation of what is required by Rule 16(b), we assert that our request is not moot and that the Court should order a compliant report." (Doc. No. 108 at pp. 10-11.)

In light of the fact that Defendants are currently supplementing Ms. Bloink's summary, the Court finds that the United States' Motion is moot with respect to the issue of sufficiency of Ms. Bloink's February 2020 summary under Rule 16(b)(1)(C). With regard to Defendants' impending supplementation of Ms. Bloink's summary, the Court notes as follows. In preparing Ms. Bloink's supplementation, Defendants should be mindful of the general principles regarding expert summaries expressed in this Opinion and make every effort to comply therewith. In particular, Defendants should be sure that Ms. Bloink's supplementation sufficiently identifies the documents she has relied

36

on, and fully explains the bases for her opinions.  Lastly, Defendants are ordered to disclose Ms. Bloink's supplementary report within 30 days of the date of this Order.

### 3.   Conclusion

The United States' Motion to Compel Compliance with Rule 16 (Doc. No. 103) is GRANTED IN PART and DENIED IN PART, as set forth above.

### B.   Motion to Enforce Administrative Subpoenas against Defendants[7] (Doc. No. 104) and Motion for Protective Order (Doc. No. 106)

In its Motion to Enforce Administrative Subpoenas, the United States argues that the Court should enforce the administrative subpoenas issued in January, March, and May 2018 and December 2019.  (Doc. No. 104.)  The United States asserts that "the subpoenas comply with the statute, seek relevant information from the Defendants that is not in the government's possession, and enforcement will not abuse the Court's process."  (*Id*. at p. 6.)

In response, Defendants filed both a Brief in Opposition and a Motion for Protective Order. (Doc. No. 106.)  Therein, Defendants maintain that the administrative subpoenas should not be enforced because they were "not issued for a lawful purpose" and "were issued in contravention of DOJ's internal guidance . . . and governing law."  (*Id*. at p. 2.)   Citing cases from the D.C. and Eleventh Circuits, as well as Section 9-44.202(5) of the DOJ's Justice Manual, Defendants maintain that "an administrative subpoena cannot be issued post-indictment to compel a criminal defendant to produce documents relevant to the criminal litigation."  (*Id*. at p.3.)  To do so, Defendants argue,

---

[7] Like the Defendants, the Court interprets the United States' June 11, 2020 Motion to Enforce (Doc. No. 104) as applying solely to the administrative subpoenas issued to Defendants Rakhit and Gupta.  As noted *supra*, on July 16, 2020, the United States filed a separate Motion to Enforce with respect to the Administrative Subpoenas issued to Ohio Cardiology Associates, Inc., and Ashis K. Rakhit, M.D., Inc., neither of which are named Defendants in the instant action.  (Doc. No. 110.)

would allow the government to make "an impermissible end run around Rules 16 and 17 of the Federal Rules of Criminal Procedure." (*Id*. at p. 1, 6.)  In addition, Defendants assert that enforcing the subpoenas would violate their act-of-production privilege under the Fifth Amendment. (*Id*. at pp. 8-9.)  Lastly, Defendants argue that the United States' Motion should be denied because it fails to identify any "responsive material" that the government does not already have. (*Id*. at pp. 9-10.)

The United States argues that health care fraud administrative subpoenas issued pursuant to 18 U.S.C. § 3486 may be issued post-indictment under the Sixth Circuit's decision in *United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993). (Doc. No. 109 at pp. 4-5.)  The United States further asserts that the subpoenas at issue herein are enforceable because "they are directed at *corporate* records, in the possession of the individual targets." (*Id*. at p. 6.)  The United States next argues that, by accepting service of the subpoenas and making two separate document productions in response thereto, Defendants have "waived the right to assert a Fifth Amendment privilege as to the rest of those patient files." (*Id*. at p. 3.)  Even if Defendants had not waived this privilege, the United States argues that three independent exceptions to act-of-production immunity apply; i.e., the required records doctrine, the foregone conclusion doctrine, and the collective entity doctrine. (*Id.* at pp. 7-8.)  Finally, the United States clarifies that it is only seeking "responsive documents and data that are not already in the government's possession." (*Id*. at p. 9.)

As the Sixth Circuit has explained, "a district court plays only a limited role in the enforcement of an administrative subpoena." *In re Administrative Subpoena, John Doe, D.P.M.*, 253 F.3d 256, 262 (6th Cir. 2001) (hereinafter "*Doe*") (citing *United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995)).  "All the district court must do in deciding whether to enforce an administrative subpoena is 1) determine whether the administrative agency to which Congress has granted the

subpoena power, in this case the DOJ, has satisfied the statutory prerequisites to issuing and enforcing the subpoena, and 2) determine whether the agency has satisfied the judicially created standards for enforcing administrative subpoenas." *Id*.

The Sixth Circuit has formulated a four-part test to address both components of this inquiry. As that court  has explained, an administrative subpoena will be enforced if:  "(1) it satisfies the terms of its authorizing statute, (2) the documents requested were relevant to the DOJ's investigation, (3) the information sought is not already in the DOJ's possession, and (4) enforcing the subpoena will not constitute an abuse of the court's process." *Id*. at 265.  *See also Markwood*, 48 F.3d at 980; *United States v. Lazar*, 2006 WL 3761803 at * 9-10 (W.D. Tenn. Dec. 20, 2006).

Here, the administrative subpoenas at issue were issued pursuant to 18 U.S.C. § 3486, which authorizes the issuance of subpoenas for information "which may be relevant to" federal health care investigations.  *See* 18 U.S.C. § 3486.  It is not disputed that this statute provides the DOJ with broad subpoena power.  *See Doe*, 253 F.3d at 265 (noting the "broad subpoena power that the statute gives to the Attorney General and her designees"); *Lazar*, 2006 WL 3761803 at * 10 (noting that "§ 3486 entrusts the government with broad subpoena powers").  The question, however, is whether the government may exercise that broad power by issuing an administrative subpoena to a criminal defendant after an indictment has been issued.

In arguing that it may, the United States relies heavily on the Sixth Circuit's decision in *United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993).  In that case, one of the defendants, Victor Rojas, challenged the government's post-indictment use of D.E.A. administrative subpoenas, pursuant to 21 U.S.C. § 876, to obtain documents and records from third parties.  *Phibbs*, 999 F.2d at 1076. Specifically, Rojas contended that the government could not use the § 876 subpoenas to obtain

evidence related to the pending indictment "without a demonstration of probable cause before a neutral magistrate." *Id*. The Sixth Circuit first compared the government's relative authority in employing the investigatory powers of the grand jury and § 876, noting as follows:

> Once a targeted individual has been indicted, the government must cease its use of the grand jury in preparing its case for trial. *United States v. Breitkreutz*, 977 F.2d 214, 217 (6th Cir. 1992). It may, however, continue to employ the grand jury process as part of an ongoing investigation, possibly leading to further charges against the subject of the former indictment. *Id.* Section 876 of title 21 simply furnishes the Attorney General and his delegates with an alternative mechanism for carrying on the investigation. **However, unlike the grand jury system, it may also be used to discover evidence related to the charges in the original indictment**.

*Id.* at 1077 (emphasis added).

The court went on to find that, should an on-premises search and inspection be required to execute the subpoena, a valid search warrant is needed as a condition precedent. *Id.* The court found that, because the administrative subpoenas in that case "were not directed at Rojas, but at third party businesses," Rojas did not have standing to dispute their issuance on Fourth Amendment grounds absent a demonstration that he had a legitimate expectation of privacy attaching to the records obtained. *Id.* Based on the nature of the records involved (credit card and telephone records), the Court found that Rojas did not have an actual and justifiable privacy interest in these materials and, therefore, lacked standing to challenge the subpoenas. *Id.*

Courts have since construed *Phibbs* as authorizing the use of post-indictment administrative subpoenas with respect to third parties. *See e.g., United States v. Wachter*, 2006 WL 2460790 at * 6 (E.D. Mo. Aug. 23, 2006) ("Generally, absent violation of the Constitution or other provision of law, and where authorized by law, the government may use an administrative subpoena, issued to third parties, to continue investigating pending charges.")

40

*Phibbs* did not, however, hold that a post-indictment administrative subpoena may be issued to a *criminal defendant* to gather information relevant to pending charges.  As noted above, the administrative subpoenas in *Phibbs* were issued not to defendant Rojas, but to unindicted third parties.  Thus, the particular issue presented herein (i.e., whether an administrative subpoena may be issued to a defendant post-indictment) was not before the Sixth Circuit in *Phibbs* and was neither discussed nor decided in that decision.  Nor has the United States directed this Court's attention to any other decision (either from within the Sixth Circuit or from any other jurisdiction) in which a post-indictment administrative subpoena has been enforced against a criminal defendant where it seeks information relevant to charges pending against that defendant.[8]

Defendants, on the other hand, cite several cases in support of their argument that an administrative subpoena may not be issued to a criminal defendant post-indictment.  In *United States v. Harrington*, 761 F.2d 1482 (11th Cir. 1985), defendants Robert Harrington and Paul McLeod were indicted (and later convicted) on charges relating to a scheme to import marijuana into the United States from Jamaica and Mexico from 1974 through the date of the indictment, August 13, 1983.  Three subpoenas were issued by the DEA under 21 USC § 876 between the indictment and trial.  *Id.* at 1485.  Defendants argued that the evidence obtained by these subpoenas should have been

---

[8] None of the cases cited by the United States in their Motion to Enforce involved the issuance of post-indictment subpoenas to criminal defendants.  *Lazar* involved the enforceability of post-indictment administrative health care subpoenas that were issued to third-party hospitals.  *Lazar*, 2006 WL 3761803 at * 1.  Both *United States v. Wachter*, 2006 WL 2460790 (E.D. Mo. Aug. 23, 2006) and *United States v. Daniels*, 2000 WL 764951 at * 4-5 (D. Kan. May 22, 2000) also involved post-indictment administrative subpoenas issued to unindicted third parties.  Moreover, although not cited by either party, the Court notes that *United States v. Rogers*, 1992 WL 217722 (6th Cir. Sept. 9, 1991) is distinguishable, as it involved a pre-indictment subpoena issued to a pharmacy owned by the defendant.  Likewise, *In re Subpoena Duces Tecum v. Bailey*, 228 F.3d 341 (4th Cir. 2000) involved the issuance of a pre-indictment administrative subpoena to the target of an investigation, rather than a post-indictment subpoena to a defendant regarding pending charges.

suppressed, citing cases indicating that it is an abuse of process to utilize a grand jury subpoena to gather evidence for trial after an indictment has been returned.  *Id.*  The Eleventh Circuit rejected this argument, explaining as follows:

> Appellants' reliance on [*United States v. Doss*, 563 F.2d 265 (6th Cir. 1977)] and [*Beverly v. United States*, 468 F.2d 732 (5th Cir. 1972)] is misplaced. Those cases deal with the power of the government to cause a grand jury to issue a subpoena to the targeted individual, either after his having been indicted or while the grand jury is considering his indictment. **The subpoenas here were not running to the indicted individuals. They were issued to third parties during a continuing investigation. As such, they were entirely legal**. *See United States v. Mountain States Telephone & Telegraph Co.,* [516 F.Supp.225 (D. Wyo. 1981)], and *United States v. Hossback,* 518 F. Supp. 759 (E.D. Pa. 1980)].  We agree with the decisions in those two cases that **the D.E.A. may issue subpoenas under Section 876 in an ongoing investigation <u>so long as they are not to run against the targeted individual</u>**. The trial court committed no error in overruling the motion to suppress in this case.

*Id.* (emphasis added).

Defendants also note that at least one district court has reached the same conclusion.  *See United States v. Kapoor*, Case No. 16-10343, Slip Op. dated Dec. 19, 2018 (D. Mass.) ("There is no doubt that the government may use a HIPAA subpoena post-indictment for investigative purposes. However, the government's authority is not limitless. **Indeed, both sides agree that a HIPAA subpoena may not be directed to a targeted individual post-indictment**.") (emphasis added) (copy attached at Doc. No. 106-1.)  Moreover, as Defendants correctly note, the Department of Justice's own guidance provides that "[a]fter an indictment has been issued, authorized investigative demands may continue to be used in furtherance of an ongoing investigation, provided they are not directed to a defendant."  Department of Justice, Justice Manual, § 9-44.202(5) (citing *Harrington, supra.*).[9]

---

[9] As the district court noted in *Kapoor*, "[w]hile the DOJ's guidance does not establish any private right of action, it may explain the unusualness of the instant subpoena and the correspondent dearth of caselaw directly on point." *Kapoor*, Case No. 16-10343, Dec. 19, 2018 Slip Op. at p. 7, fn 7.

In light of the above, the Court agrees with Defendants that post-indictment, heath care administrative subpoenas that seek information that may be relevant to pending charges may not be directed towards a criminal defendant.  As discussed above, *Phibbs* does not stand for the proposition that post-administrative subpoenas may be used for such a purpose, and the United States is unable to cite a single decision in which a post-indictment administrative subpoena has been enforced against a criminal defendant.  Further, although not binding, the Court finds it noteworthy that the DOJ's own guidance expressly counsel against the use of administrative subpoenas under the very circumstances presented herein.

The United States argues, however, that the subpoenas at issue are nonetheless enforceable because they are directed at *corporate* (as opposed to personal) records that belong to the incorporated medical practices but are in the possession of the Defendants.  (Doc. No. 109 at p. 6.)   The Court rejects this argument.  As Defendants correctly note, the subpoenas were clearly issued to Defendants in their individual capacities and served on their personal attorneys.  There is nothing on the face of the subpoenas to indicate that they were issued to Defendants in their capacities as custodians of the records belonging to their incorporated medical practices.  (Doc. Nos. 104-1 at PageID#s 2028, 2034; Doc. No. 104-3 at PageID#s 2058, 2067, Doc. No. 104-8 at PageID#s 2099, 2106.)  Indeed, in the Definitions attached to the subpoenas, the term "you" is defined as the Defendants as individuals — not the Defendants in their capacities as records custodians.  (Doc. Nos. 104-2 at PageID# 2036; Doc. No. 104-3 at PageID#s 2060, 2069; Doc. No. 104-8 at PageID# 2101, 2108.)  The United States could easily have subpoenaed the Defendants in their capacities as records custodians.  It failed to do so, however, and cannot now (two years later) attempt to recast the subpoenas at issue in an attempt to

43

avoid *Harrington, supra* and the directives set forth in Section 9-44.202(5) of the DOJ's own Justice Manual.

Accordingly, and for all the reasons set forth above, the Court finds the post-indictment administrative subpoenas issued to Defendants herein are improper and unenforceable as a matter of law.[10]  Defendant's Motion for Protective Order (Doc. No. 106) is, therefore, GRANTED, and the United States' Motion to Enforce the Administrative Subpoenas issued to the Defendants (Doc. No. 104) is DENIED.

### C.      Motion to Enforce Administrative Subpoenas against Ohio Cardiology Associates, Inc. and Ashis K. Rakhit, M.D., Inc.  (Doc. No. 110)

On July 16, 2020, the United States filed a separate Motion to Enforce with respect to the administrative subpoenas issued to Ohio Cardiology Associates, Inc., and Ashis K. Rakhit, M.D., Inc. (hereinafter referred to collectively as the "Corporate Entities").  (Doc. No. 110.)  Therein, the United States argues the subpoenas are enforceable because neither of the Corporate Entities have been indicted and *Phibbs* clearly authorizes the use of post-indictment administrative subpoenas against unindicted third parties.  (*Id.* at p. 5.)  The United States further asserts that "corporations (even closely held ones) have no act-of-production privilege" under the Fifth Amendment and, even if they did, enforcement of the subpoenas would nonetheless be appropriate under the required records, foregone conclusion, and/or collective entity doctrines.  (*Id.*)  Finally, the United States maintains that the Court should enforce the subpoenas because they seek relevant information that is not already in the government's possession.  (*Id.*)

---

[10] Because this Court has found that the subpoenas are improper, it need not reach Defendants' arguments that the subpoenas violate their Fifth Amendment rights.

44

The United States asks that the Court order the Corporate Entities "to comply with the subpoenas, produce any documentation and/or data that is responsive and has not yet been produced, with priority given to those patients addressed in the parties' expert reports, and produce a custodian who can testify regarding the production and its authenticity." (*Id.* at p. 6.)

In response, Defendants first argue that this Court lacks personal jurisdiction over the Corporate Entities because they (1) are not parties to this litigation; and (2) were never served with a copy of the Government's Motion. (Doc. No. 117 at p. 2.) Defendants next assert that the administrative subpoenas should not be enforced because the Corporate Entities are wholly owned by the Defendants and, thus, they "run against" the Defendants themselves, contrary to both *Harrington*, *supra* and Section 9-44.202(5) of the Justice Manual. (*Id.* at p. 3.) Specifically, Defendants maintain that "[i]f the Court orders the Corporate Entities to respond to the administrative subpoenas, which were issued after the grand jury returned an indictment, the Court would, in effect, be ordering the Rakhits to compile these records and then 'testify regarding the production and its authenticity.'" (*Id.* at p. 4.) Although acknowledging that some courts have enforced post-indictment subpoenas against "strangers to the litigation," Defendants maintain that "the government does not point the Court to any legal authority from any court in the country where a court has enforced an administrative subpoena issued after an indictment to a criminal defendant or his or her closely held corporation." (*Id.* at p. 5.)

In its Reply, the United States first responds to the issue of personal jurisdiction by noting that, during a status conference with counsel, this Court expressly instructed the government to file the Motion to Enforce against the Corporate Entities in this case (as opposed to through a separate miscellaneous motion) and Defendants failed to object. (Doc. No. 118 at p. 3.) The United States

45

further notes that defense counsel previously agreed to accept service of the corporate subpoenas without ever indicating that that they considered the subpoenas to be improper or in any way deficient and, therefore, "it is simply disingenuous to say there was a failure of service" with respect to the Government's Motion.  (*Id*. at p. 3.)  To the contrary, the United States argues that, by accepting service of the subpoenas on behalf of the Corporate Entities and producing documents in response, Defendants waived their right to contest them.  (*Id*. at p. 7.)

The United States next asserts that it is well established that corporations (even closely held ones) do not enjoy Fifth Amendment rights.  (*Id*. at p. 3-4.)  Even if corporations did enjoy such rights, the United States argues that several exceptions to that privilege apply, none of which have been challenged or otherwise addressed by Defendants.  (*Id*. at p. 7.)  Most notably, the United States relies on the "collective entity doctrine," which holds that "an individual cannot rely upon the [Fifth Amendment] privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him." *Bellis v. United States*, 417 U.S. 85, 88 (1974).  *See also Braswell v. United States*, 487 U.S. 99, 110 (1998).  Finally, the United States argues that neither case law or DOJ policy prevents the issuance of administrative subpoenas to unindicted third parties.  (*Id.* at p. 8.)

The Court first addresses the issue of whether the instant Motion is properly before this Court. For the following reasons, the Court finds that it is.  As the United States correctly notes, during a telephone conference with counsel on May 12, 2020, the Government advised the Court that it intended to file a motion to enforce the administrative subpoenas at issue.  *See* Non-Document Order dated May 12, 2020.  At that time, the Court "advised that any motion seeking the enforcement remedy [pursuant to 18 U.S.C. § 3486] can be filed with this Court, as distinguished from the

miscellaneous duty judge."  (*Id.*)  Defendants raised no objection to this procedure during the conference call.  (*Id.*)  Having failed to object at the time, the Court is not persuaded by Defendants' attempt to now argue that this motion is not properly before the Court because the Corporate Entities are not parties to the litigation.  Likewise, and in light of the fact that Defendants accepted service of the administrative subpoenas on behalf of the Corporate Entities on four separate occasions over the past two years without objection, the Court rejects Defendants' argument that the United States' Motion is improper because it was not served on the Corporate Entities.

The Court also rejects Defendants' argument that the administrative subpoenas issued to the Corporate Entities are improper by virtue of the fact that those Entities are wholly owned by Defendants.  It is well established that corporations are separate legal entities, distinct from the natural individuals that own and/or operate them.  *See Braswell*, 487 U.S. at 105 ("'[W]e are of the opinion that there is a clear distinction . . .  between an individual and a corporation . . .'") (quoting *Hale v. Henkel*, 201 U.S. 43, 74 (1906)).  Here, Ohio Cardiology Associates, Inc. and Ashis K. Rakhit, M.D., Inc. are separate legal entities from the Defendants, and neither of these Corporate Entities have been indicted.  As discussed above, the Sixth Circuit has expressly held that post-indictment administrative subpoenas may be issued to third parties to discover evidence related to charges in the original indictment.  *Phibbs*, 999 F.2d at 1077.  *See also Wachter,* 2006 WL 2460790 at * 6 (noting that, "generally . . . the government may use an administrative subpoena, issued to third parties, to continue investigating pending charges.").  Thus, the administrative subpoenas issued to the Corporate Entities are authorized under the express language of *Phibbs, supra.*

Defendants argue, however, that *Phibbs* does not apply to the instant subpoenas because the Corporate Entities herein are wholly owned by the Defendants. Defendants cite to no language in

*Phibbs* itself that makes an exception to the use of post-indictment administrative subpoenas under these circumstances.  Nor do Defendants cite any authority (either from the Sixth Circuit or otherwise) that suggests that post-indictment subpoenas may not be used as against unindicted corporate entities that are closely held by criminal defendants.  To the contrary, the Court finds that Defendants' argument is inconsistent with a long line of Supreme Court cases regarding the Fifth Amendment and the so-called "collective entity" doctrine. [11]

In *Bellis v. United States*, 417 U.S. 85 (1974), for example, the Supreme Court held that a partner in a three-partner law firm could not invoke his Fifth Amendment privilege against self-incrimination to avoid a subpoena seeking partnership records.  *Id.* at 87.  In so holding, the Court noted its "long line of cases" adhering to the so-called "collective entity doctrine," which states that "an individual cannot rely on the [Fifth Amendment] privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally." *Id*. at 88. Since no artificial organization may utilize the personal privilege against compulsory self-incrimination, the Court found that "it follows that an individual acting in his official capacity on behalf of the organization may likewise not take advantage of his personal privilege." *Id*. at 90. The Court noted its "consistent view that the privilege against compulsory self-incrimination should be 'limited to its historic function of protecting only the natural

---

[11] The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  The Fifth Amendment privilege against self-incrimination extends only to "compelled incriminating communications" that are "'testimonial' in character." *United States v. Hubbell*, 530 U.S. 27, 34, (2000). One aspect of the Fifth Amendment privilege is the "act of production" doctrine, which recognizes that "the act of producing documents in response to a subpoena may have a compelled testimonial act," in that the act "may implicitly communicate 'statements of fact," such as "that the papers existed, were in [the producer's] possession or control, and were authentic."  *Id.* at 36.

48

individual from compulsory incrimination through his own testimony or personal records.'" *Id.* (quoting *United States v. White*, 322 U.S. 694, 701 (1944)).

In reaching this conclusion, the Court explicitly rejected Bellis' argument that, due to the modest size of his partnership, it was unrealistic to consider the law firm as an entity independent of its three partners.  *Id.*  After examining evidence regarding the "formal institutional arrangement" of the law firm, as well as the nature of the subpoenaed records, the Court found that "petitioner's possession of the partnership's financial records in what can be fairly said to be a representative capacity compels our holding that his personal privilege against compulsory self-incrimination is inapplicable." *Id.* at 100.  Notably, in so finding, the Court emphasized that the size of the organization was immaterial, noting that "we do not believe the Court's formulation ... can be reduced to a simple proposition based solely on the size of the organization.  **It is well settled that no privilege can be claimed by the custodian of corporate records, regardless of how small the corporation may be.**" *Id*. at 100 (emphasis added).

The Court reached a similar conclusion several years later, in *Braswell v. United States*, 487 U.S. 99 (1988).  In that case, Braswell, a corporate custodian of two small, closely held corporations, sought to assert his Fifth Amendment privilege to refuse production of corporate documents, arguing that producing the documents would incriminate him personally.  *Id.* at 100-101.  The Supreme Court rejected Braswell's argument, holding that a corporate "custodian may not resist a subpoena for corporate records on Fifth Amendment grounds," regardless of whether the custodian could "show that his act of production would entail testimonial self-incrimination."  *Id*. at 104, 113.  The Court explained as follows:

> [T]he Court has consistently recognized that the custodian of corporate or entity records holds those documents in a representative rather than a personal capacity.

> Artificial entities such as corporations may act only through their agents, *Bellis, supra*, 417 U.S., at 90, 94 S. Ct., at 2184, and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government.  Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege.

*Id*. at 109-110.  The Court also emphasized the policy considerations underlying its holding:

> We note further that recognizing a Fifth Amendment privilege on behalf of the records custodians of collective entities would have a detrimental impact on the Government's efforts to prosecute 'white-collar crime,' one of the most serious problems confronting law enforcement authorities.   [fn omitted] 'The greater portion of evidence of wrongdoing by an organization or its representatives is usually found in the official records and documents of that organization. Were the cloak of the privilege to be thrown around these impersonal records and documents, effective enforcement of many federal and state laws would be impossible.' *White,* 322 U.S., at 700, 64 S. Ct., at 1252. If custodians could assert a privilege, authorities would be stymied not only in their enforcement efforts against those individuals but also in their prosecutions of organizations. In *Bellis,* the Court observed: 'In view of the inescapable fact that an artificial entity can only act to produce its records through its individual officers or agents, recognition of the individual's claim of privilege with respect to the financial records of the organization would substantially undermine the unchallenged rule that the organization itself is not entitled to claim any Fifth Amendment privilege, and largely frustrate legitimate governmental regulation of such organizations.' 417 U.S., at 90, 94 S.Ct., at 2184.

*Id*. at 115-116.

Since *Bellis* and *Braswell,* federal courts have routinely rejected efforts to carve out an exception to the "collective entity doctrine" for custodians of small, closely held entities.[12]  *See e.g., In re Grand Jury Subpoena,* 908 F.3d 525 (9th Cir. 2018) (holding that "to recognize an exception

---

[12] Although not expressly mentioned by Defendants, the Court notes that, in a footnote in *Braswell*, the Supreme Court left open "the question whether the agency rationale supports compelling a custodian to produce corporate records when the custodian is able to establish, by showing for example that he is the sole employee and officer of the corporation, that the jury would inevitably conclude that he produced the records." *Braswell*, 487 U.S. at fn 11.  Here, Defendants have not directed this Court's attention to any evidence that they are the sole employees and officers of the Corporate Entities at issue.  Moreover, in *In re Grand Jury Subpoenas, supra*, the Ninth Circuit expressly rejected the argument that footnote 11 of *Braswell* creates an exception for custodians of small, closely held collective entities.   *See In re Grand Jury Subpoenas*, 908 F.3d at 529-531.

for custodians of small, closely held collective entities, including one-person corporations or LLCs, would be inconsistent with the reasoning and holding of *Braswell*."); *In re Grand Jury Empaneled on May 9, 2014*, 786 F.3d 255, 263 (3d Cir. 2015) ("Appellants have advanced no persuasive rationale as to why the reasoning of *Bellis* and *Braswell* does not apply to one-person corporations*."); In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 158 (2d Cir. 2010) ("'[T]here simply is no situation' in which a corporation can avail itself of the Fifth Amendment privilege." ) (quoting *In re Two Grand Jury Subpoenae Duces Tecum*, 769 F.2d 52, 57 (2d Cir. 1985)); *Amato v. United States*, 450 F.3d 46, 51, 52 (1st Cir. 2006) (reaffirming that "production, including implied authentication, can be required of a corporation through a corporate officer regardless of the potential for self-incrimination," and stating that "the act-of-production doctrine is not an exception to the collective-entity doctrine even when the corporate custodian is the corporation's sole shareholder, officer and employee") (citing *In re Grand Jury Proceedings*, 838 F.2d 624, 626–27 (1st Cir. 1988)); *United States v. Stone*, 976 F.2d 909, 912 (4th Cir. 1992) (holding that the district court correctly concluded that a one-person corporation could not assert the Fifth Amendment privilege).

In light of the above, the Court is not persuaded by Defendants' argument that the administrative subpoenas at issue herein are unenforceable because the Corporate Entities are wholly owned by the Defendants. [13]  Defendants do not argue that the records sought by the subpoenas are

---

[13] The Court does not have any evidence or documentation before it regarding either the Corporate Entities' corporate structure and/or ownership, or its officers, directors, shareholders, employees, etc.  Neither party disputes that both Ohio Cardiology Associates, Inc. and Ashis K. Rakhit, M.D., Inc. are, in fact, corporations. The Court notes, however, that in support of its briefing relating to its Motion to Enforce the Subpoenas directed to the Defendants, the United States attaches a collection of documents relating to Defendants' Provider Agreements and Applications.  In one of these documents, there is reference to Dr. Gupta as belonging to a "sole proprietorship."  (Doc. No. 109-2 at PageID# 2371.) Defendants do not mention this document or otherwise argue that either of the Corporate Entities are not, in fact, corporations.  Thus, the Court presumes for purposes of this Opinion that both of the Corporate Entities herein are corporations.

personal in nature.  Nor do they directly address the United States' argument that the collective entity doctrine applies herein.[14]   Rather, Defendants' argument is predicated solely on the fact that the Corporate Entities are wholly owned by Defendants.  However, as discussed at length above, the Supreme Court has made clear time and again that corporations are separate and distinct from the natural individuals that own them.  Under this authority, even closely held corporations cannot evade subpoenas seeking the production of corporate records on the grounds that the act of production could entail testimonial self-incrimination on the part of the corporate custodian.

Defendants have not demonstrated that this principle is inapplicable in the present circumstances, with regard to the production of documents.  Defendants made the choice to incorporate their medical practices.  Having received the benefits of incorporation, Defendants cannot now seek to evade the responsibilities and obligations that come along with it.  As another district court within this Circuit explained under similar circumstances:

> Mary Roe made a choice to incorporate.  She could have chosen to operate her consulting business in another form.  Had she established John Doe as a sole

---

[14] In a footnote, Defendants argue that *Braswell* "has been undermined" by the Supreme Court's more recent decisions in *Citizens United v. FEC*, 558 US 310 (2010) and *Burwell v. Hobby Lobby Stores, Inc.*, 573 US 682 (2014).  In those cases, the Supreme Court recognized that closely held corporations may exercise First Amendment speech rights and engage in protected religious exercise.  Defendants assert that these decisions compel the conclusion that Braswell is no longer good law and that, "[j]ust as the government cannot compel closely held corporations . . . from purchasing health insurance coverage for contraceptives for their employees, the government cannot compel corporations and their records custodians from producing incriminatory documents – in violation of the Fifth Amendment." (Doc. No. 117 at fn 1.)  The Court disagrees.  Both the Third and the Ninth Circuits have expressly rejected this argument.  *See In re Grand Jury Subpoenas*, 908 F.3d 525, 528 (9th Cir. 2018); *In the Matter of Grand Jury Empaneled on May 9, 2014*, 786 F.3d 255, fn 1 (3rd Cir. 2015).  As the Ninth Circuit explained: "[W]e are skeptical that either [*Citizens United* or *Hobby Lobby*] has any bearing on the collective entity rule as articulated and applied in *Braswell*. But, regardless, we remain bound by *Braswell* until the Supreme Court says otherwise. Where Supreme Court precedent 'has direct application in a case,' the Supreme Court has instructed 'the Court of Appeals [to] follow the case which directly controls,' even if it 'appears to rest on reasons rejected in some other line of decisions,' and thereby to 'leav[e] to th[e] Court the prerogative of overruling its own decisions.' *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ). *Braswell* has direct application in this case, and it is not for us to question its continuing validity or persuasiveness."  *In re Grand Jury Subpoenas*, 908 F.3d at 528.  The Court agrees with the Ninth Circuit's reasoning and, therefore, rejects Defendants argument that Braswell is "no longer good law."

proprietorship, she could have claimed Fifth Amendment protection. *See United States v. Doe*, 465 U.S. 605, 617 (1984). Her choice to incorporate 'generate[d] benefits, such as limited liability, and burdens, such as the need to respond to subpoenas for corporate records.' *In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d at 159. Having made a choice to incorporate, Mary Roe 'is not entitled to have [her] cake and eat it too.' *Maxey & Co., P.C.*, 956 F. Supp. at 829; *see also Feng Juan Lu*, 248 Fed. Appx. at 808; *Stone*, 976 F.2d at 912 (4th Cir. 1992); *Williams*, 2010 WL 2854295, at *5. She may not, in other words, disregard her choice to incorporate, claim Fifth Amendment protection, and shield her business records from production. *See Stone*, 976 F.2d at 912.

*In re Grand Jury Subpoena (John Doe, Inc.)*, 991 F.Supp.2d 968, 976 (E.D. Mich. 2014).

Accordingly, the Court orders the Corporate Entities to comply with the administrative subpoenas at issue and produce any documents that are responsive and have not yet been produced, with priority given to documents relating to those patients that are addressed in the parties' expert reports.

Lastly, the Court notes that, in its Motion, the United States also asks the Court to order the Corporate Entities to "produce a custodian who can testify regarding the production and its authenticity." (Doc. No. 110 at p. 6.) Defendants do not directly address this particular issue.

The Supreme Court has held that a records custodian may be asked to authenticate corporate records. In *Curcio v. United States*, 354 U.S. 118 (1957), the Supreme Court held that the secretary of a union local could refuse to answer questions about the location of subpoenaed union records, which the secretary did not possess. However, the privilege did not apply to questions about the authenticity of documents in his possession. The Court reasoned:

The custodian's act of producing books or records in response to a subpoena duces tecum is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission in evidence merely makes explicit what is implicit in the production itself. The custodian is subjected to little, if any, further danger of incrimination.

53

*Id*. at 125. "Because the act of producing documents is deemed tantamount to authenticating them, the cases that withhold the Fifth Amendment privilege from agents of one-person collective entities also apply to the authentication question." *In re Grand Jury Subpoena (John Doe, Inc.)*, 991 F.Supp.2d 968, 977 (E.D. Mich. 2014) (citing *Amato*, 450 F.3d at 52–53 ("One of those [corporate] responsibilities is to produce and authenticate records of the corporation when they are subpoenaed by a grand jury." (quoting *In re Grand Jury Proceedings* (The John Doe Co., Inc.), 838 F.2d 624, 627 (1st Cir.1988))).

Thus, and in the absence of any specific objection, the Court grants the United States' request that the Corporate Entities produce a custodian who can testify regarding the *authenticity* of the documents produced in response to the subpoenas. The Court reserves ruling, however, regarding the propriety of any attempt to elicit testimony from the custodian regarding any matters other than the authenticity of the documents in question.

Accordingly, the United States' Motion to Enforce Administrative Subpoenas directed to the Corporate Entities (Doc. No. 110) is GRANTED as set forth above. Within thirty (30) days of the date of this Order, the Corporate Entities must produce any responsive documents that are not already in the government's possession.

## III.   Conclusion

For all the reasons set forth above, the United States' Motion to Compel Compliance with Rule 16(b) (Doc. No. 103) is GRANTED IN PART and DENIED IN PART. As discussed in detail *supra*, the Court orders as follows:

1.      By no later than thirty (30) days before trial, Defendants must produce to the United States all documents subject to disclosure under Rule to 16(b)(1)(A). In addition, Defendants are

reminded of their continuing obligation to timely supplement their reciprocal discovery disclosures pursuant to Rule 16(c).

2.      By no later than thirty (30) days from the date of this Order, Defendants are required to supplement the expert summaries of Drs. Charash, Miser, Langer, Marmur, Ross and Sharma, as discussed in detail in Section II.A.2, *supra*.

3.      Defendants shall produce readable versions of the S.S. June 2015 NST image and S.F. June 2016 NST image to the United States within thirty (30) days of the date of this Order.

4.      Defendants shall disclose Ms. Bloink's supplementary report within thirty (30) days of the date of this Order.

Defendants' Motion for Protective Order (Doc. No. 106) is GRANTED, and Plaintiff's Motion to Enforce Administrative Subpoenas against the Defendants (Doc. No. 104) is DENIED.

Lastly, Plaintiff's Motion to Enforce Administrative Subpoenas against Ohio Cardiology Associates, Inc. and Ashis K. Rakhit, M.D., Inc. (Doc. No. 110) is GRANTED as set forth above. Within thirty (30) days of the date of this Order, the Corporate Entities must produce any responsive documents that are not already in the government's possession.

**IT IS SO ORDERED.**


                                                     s/Pamela A. Barker
                                                    PAMELA A. BARKER
Date: September 15, 2020                            U. S. DISTRICT JUDGE