IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **United States of America,** | Case No. 1:18cr33 |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **Ashis Rakhit, et al.,** | **MEMORANDUM OPINION AND** |
| **Defendants** | **ORDER** |

Currently pending is the Motion of Non-Parties Ashis K. Rakhit, M.D., Inc. and Ohio Cardiology Associates, Inc. to Shift Costs. (Doc. No. 124-1.) The United States filed a Brief in Opposition on April 8, 2021. (Doc. No. 132.) Non-Parties Ashis K. Rakhit, M.D., Inc. and Ohio Cardiology Associates, Inc. did not file a reply. For the following reasons, the Motion to Shift Costs (Doc. No. 124-1) is DENIED.

**I.     Relevant Background**

Defendants Ashis Rakhit ("Dr. Rakhit") and Jayati Gupta Rakhit ("Dr. Gupta") are husband and wife medical doctors who specialize in cardiovascular disease and internal medicine. (Doc. No. 46 at ¶ 1.) In the mid-1990s, Dr. Rakhit formed Ashis K. Rakhit, M.D., Inc., and Dr. Gupta formed Ohio Cardiology Associates, Inc. (hereinafter referred to as "the Corporate Entities"). (*Id*. at ¶ 2.) Collectively, Defendants had four practice locations, in Cleveland, Strongsville, and Parma, Ohio. (*Id*. at ¶ 3.)

On January 17, 2018, Defendants were indicted on multiple counts of (1) conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 1); (2) health care fraud in violation of 18 U.S.C. § 1347 and 2 (Counts 2 through 12); (3) false statements relating to health care matters

in violation of 18 U.S.C. § 1035 and 2 (Counts 13 through 18); and (4) distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and (b)(2) (Counts 19 through 24). (Doc. No. 1.) The Indictment charged that, from January 2011 to the present, Defendants illegally distributed prescription-controlled substances to customers located in the Northern District of Ohio, including prescriptions for oxycodone, tramadol, and alprazolam. (*Id.* at ¶ 23.) It further charged that, during this same time period, Defendants committed health care fraud by submitting billings to Medicare and Medicaid for services that were not medically necessary, or by using inflated or "upcoded" codes that reflected services more costly than those which were actually performed. (*Id.* at ¶¶ 35.) Lastly, Defendants were charged with knowingly making materially false and fraudulent statements in connection with claims for reimbursement, including false diagnoses for certain patients. (*Id.* at ¶ 44.)

On January 23, 2018, law enforcement agents executed search warrants at the Defendants' practice locations. (Doc. No. 104 at p. 2.) The search warrants authorized the government to seize fourteen (14) categories of documents, including the following: (1) certain patient records, (2) prescriptions and/or prescription logs, patient sign-in sheets and/or logs, and any other information showing patient volume; (3) contracts, agreements, papers, and affiliated records relating to purchases of medical equipment and supplies; (4) documents relating to all current and former employees; (5) documents consisting, concerning or relating to work and personal diaries, calendars, logs, appointment books and schedules; (6) correspondence to and from Medicare, Medicaid and/or private insurance companies; and (7) financial books, records, and documents. *See, e.g.,* Doc. No. 125-1 at PageID#s 2595-2596.

On that same date, the United States served administrative subpoenas *duces tecum* on (1) Dr. Rakhit, (2) Dr. Gupta, (3) Ashis K. Rakhit, M.D., Inc.; and (4) Ohio Cardiology Associates, Inc. (Doc. No. 104-1.) These subpoenas were issued pursuant to 18 U.S.C. § 3486 and required the recipients to preserve and produce the following twelve (12) categories of documents:

> 1. All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to purchases of medical equipment and supplies by [the recipient] or any representative acting on behalf of [the recipient] to include, but not be limited to, manufacturer catalogs, purchase orders, invoices, and receipts.
>
> 2. All correspondence, including but not limited to letters and emails, constituting, concerning, or relating to efforts to collect copayments and/or deductibles for individuals that receive health care coverage from Medicare (including Medicare contractors), Medicaid, Medicaid Managed Care Organizations (MCOs), and private insurance companies.
>
> 3. All correspondence and cancelled checks relating to notice of overpayment and request for refunds from Medicare (including Medicare contractors), Medicaid, Medicaid Managed Care Organizations, and private insurance companies.
>
> 4. All correspondence to and from Medicare (including Medicare contractors), Medicaid, Medicaid Managed Care Organizations, and private insurance companies, including, but not limited to, manuals, advisories, newsletters, bulletins, and publications.
>
> 5. All correspondence to and from patients regarding Medicare (including Medicare contractors), Medicaid, Medicaid Managed Care Organizations and private insurance companies.
>
> 6. Financial books, records, and documents constituting, concerning, or relating to [the recipient], including, but not limited to, records of payment by [the recipient].
>
> 7. All contracts, agreements, or documents affiliated with any outside medical insurance company and [the recipient].
>
> 8. All contracts, agreements, or documents affiliated with any nuclear stress test technician or ultrasound technician for services provided on behalf of [the recipient], including, but not limited to, contracted technicians and technical support.

> 9. All correspondence, including but not limited to emails, between [the recipient], and any entity where [the recipient] provided services or any entity on behalf of which [the recipient] provided services.
>
> 10. All documents relating to [the recipient]'s work schedule, including, but not limited to, calendars, timesheets, appointment ledgers, hospital schedules and Microsoft Outlook calendars for all cardiology and internal medicine services.
>
> 11. All documents that relate to any amount charged by or amount reimbursed to [the recipient] for any procedure, treatment or related service provided to the beneficiaries listed in Attachment B, including, but not limited to, superbills, claims, remittance notices, explanation of benefits, and other documents that relate to the description of the procedure, service, or treatment, and to any codes and units of service billed. Please include all correspondence with these patients.
>
> 12. The complete medical records for the beneficiaries listed in Attachment B,[1] including, but not limited to: (a) orders, (b) facility and/or clinical records, (c) treatment plans, (d) SOAP notes, (e) history and physical examinations, (f) physician progress notes, (g) nursing notes, (h) any staff notes relating to cardiology and/or internal medicine, (i) daily treatment notes, (j) flow sheets, (k) equipment supply/order sheets, (l) labs and diagnostic test results, (m) nuclear stress tests results, including the nuclear camera file, (n) all catheterization films in digital or other format.

*See* Doc. Nos. 104-1, 104-2. The Subpoenas sought documents relating to the seven-year time period between January 1, 2011 and the date of issuance of the subpoena. (Doc. No. 104-2 at PageID# 2037).

On March 27, 2018, the United States served another set of administrative subpoenas pursuant to 18 U.S.C. § 3486, again on (1) Dr. Rakhit, (2) Dr. Gupta, (3) Ashis K. Rakhit, M.D., Inc.; and (4) Ohio Cardiology Associates, Inc. (Doc. No. 104-3.) These Subpoenas sought the same material as the January 2018 subpoenas but with respect to 32 additional patients. (*Id*.) The United States indicates that each of these subpoenas were served on counsel for the named Defendants. (Doc. No. 104 at p. 4.)

---

[1] Attachment B to the Subpoenas listed 265 specific patients. (Doc. No. 104-2 at PageID# 2041-2047.)

On April 10, 2018, counsel for the United States emailed defense counsel for an update regarding Defendants' production in response to the subpoenas. (Doc. No. 104-4.) In that email, counsel for the United States stated that "[a] lot of what we requested was seized during the execution of the search warrant, but we believe that nine of the patient files listed in the subpoenas were not located during the search and we would like the files produced or a written response explaining why they are not being produced." (*Id*.) On April 25, 2018, defense counsel produced responsive documents on behalf of Defendants, as well as on behalf of the Corporate Entities. (Doc. No. 104-6.) According to the United States, this production included the files for six of the nine missing patients. (Doc. No. 104-7.)

Thereafter, on May 3, 2018, the United States served additional administrative subpoenas pursuant to 18 U.S.C. § 3486, on both Defendants and the Corporate Entities. (Doc. No. 104-8.) These Subpoenas sought the same material as the January and March 2018 subpoenas but with respect to one additional patient. (*Id*.) The United States avers that each of these subpoenas were served on counsel for the named Defendants. (Doc. No. 104 at p. 5.)

On January 16, 2019, the grand jury returned a Superseding Indictment against Dr. Rakhit and Dr. Gupta, which added numerous charges of health care fraud and unlawful distribution of controlled substances. (Doc. No. 46.)

On December 17, 2019, the United States served an administrative subpoena on Defendants and Ohio Cardiology Associates, Inc., pursuant to 18 U.S.C. § 3486. (Doc. No. 104-9.) This subpoena sought the production of "all patient medical records" from January 24, 2018 through the present for thirteen (13) specific patients. (*Id*.) On January 29, 2020, defense counsel produced

5

responsive documents for two of the thirteen patients identified in the December 2019 subpoena. (Doc. No. 104-10.)

On May 12, 2020, the Court conducted a telephonic status conference with counsel for the United States and counsel for Defendants. During the conference, the United States advised the Court that it intended to file a motion to enforce the administrative subpoenas at issue. *See* Non-Document Order dated May 12, 2020. At that time, the Court "advised that any motion seeking the enforcement remedy [pursuant to 18 U.S.C. § 3486] can be filed with this Court, as distinguished from the miscellaneous duty judge." (*Id.*) Defendants raised no objection to this procedure during the conference call. (*Id.*)

On June 11, 2020, the United States filed a Motion to Enforce Administrative Subpoenas as against Defendants. (Doc. No. 104.) Shortly thereafter, on July 16, 2020, the United States filed a Motion to Enforce Administrative Subpoenas as against the Corporate Entities. (Doc. No. 110.) Defendants opposed both Motions. (Doc. Nos. 106, 117.)

On September 15, 2020, the Court issued a lengthy Memorandum Opinion & Order in which it denied the Motion to Enforce as against Defendants but granted the Motion to Enforce as against the Corporate Entities. (Doc. No. 119.) The Court ordered the Corporate Entities to comply with the administrative subpoenas at issue and produce any responsive documents that had not yet been produced, with priority given to documents relating to those patients that are addressed in the parties' expert reports. (*Id.* at p. 53.)

In November 2020, the Corporate Entities produced over 35,000 documents in response to the United States' administrative subpoenas. (Doc. No. 124-2.) In so doing, the Corporate Entities

6

state that they incurred $13,736.30 in expenses relating to collecting, copying, scanning, Bates stamping, and producing these documents. (Doc. No. 124-1 at p. 4; Doc. No. 124-3.)

On December 15, 2020, the Corporate Entities filed a Motion for Leave to Intervene and for Leave to File a Motion to Shift Costs, *Instanter*. (Doc. No. 124.) The United States filed a Brief in Opposition on December 29, 2020, to which the Corporate Entities replied on January 5, 2021. (Doc. Nos. 126, 127.)

On March 25, 2021, the Court issued a Memorandum Opinion & Order in which it denied the Motion to the extent the Corporate Entities sought formal intervention but granted it to the extent the Corporate Entities sought leave to file a Motion to Shift Costs. (Doc. No. 130.) In that same Order, the Court found that the Corporate Entities' Motion to Shift Costs was deemed filed as of the date of the Order and provided the United States fourteen days to file a response. (*Id.* at p. 11.)

The United States filed a Brief in Opposition on April 8, 2021. (Doc. No. 132.) The docket reflects that the Corporate Entities did not file a reply.

II.     Analysis

In their Motion to Shift Costs, the Corporate Entities argue that the United States should be held responsible for the costs incurred in responding to the subpoenas because the subpoenas "were broadly worded, covered a 7-year time period, and requested documents that could have been seized years ago (when the government executed search warrants in 2018)." (Doc. No. 124-1 at p. 1.) Citing decisions from the Third and Sixth Circuits, the Corporate Entities argue that this Court has the authority under Fed. R. Civ. P. 45 and 81 to protect non-parties where the costs of complying with an administrative subpoena exceeds reasonably expected business expenses. (*Id.* at p. 5-6.) The Corporate Entities maintain that the Court should exercise its discretion to shift costs in light of the

fact that the administrative subpoenas "employed broad and expansive language" and "the government took no steps to alleviate the [Corporate Entities'] burden of compliance." (*Id.* at p. 7.)

The United States argues that the Corporate Entities' Motion should be denied for several reasons. (Doc. No. 132.) First, the United States asserts that, by the Defendants' own admission, the Corporate Entities are wholly owned and controlled by Defendants and, thus, are not separate, disinterested parties as regards the subpoenas. (*Id*. at p. 7.) The United States maintains that the Corporate Entities' Motion should be denied because it essentially "ask[s] this Court to exercise its discretion to order the government to reimburse indicted defendants for costs incurred as a result of the government's investigation of their crimes." (*Id*. at p. 8.)

The United States next argues that the Corporate Entities "waived the right to seek cost shifting by failing to raise their overbreadth argument in opposition to the government's Motion to Enforce, by way of a Motion to Quash, or otherwise to the government at any time before their productions." (*Id.* at pp. 2, 8.) Rather than timely raising any concerns regarding the scope of the subpoenas, the United States argues, the Corporate Entities "partially complied with the subpoenas, forced the Court to order them to comply fully, and then waited until after their compliance to say that compliance was burdensome." (*Id.* at p. 10.) Thus, the United States argues the Court should find that the Corporate Entities forfeited their right to raise this issue now. (*Id*.)

Finally, the United States argues that the Corporate Entities have failed to demonstrate that the subpoenas at issue are overbroad and/or unduly burdensome. (*Id*. at p. 11.) The United States asserts that "given the lengthy and detailed indictment describing a wide-ranging scheme, the subpoenas are reasonable in scope." (*Id*.) Moreover, the United States argues that the fact that the Corporate Entities produced 35,000 pages in response to the subpoenas is misleading given that the

8

Corporate Entities reproduced back to the government documents that the FBI gave to the Corporate Entities after the execution of the search warrants. (*Id*.) The United States also asserts that the Corporate Entities produced "numerous patient files" that are outside the scope of the subpoenas. (*Id*.) Lastly, the United States notes that the Corporate Entities "cite no authority for the proposition that the government's failure to seize [the requested documents] pursuant to search warrants results in forfeiture of the right to obtain them later by subpoena." (*Id*. at p. 12.)

The Corporate Entities did not file a response.

Fed. R. Civ. P. 45 "does not apply to the enforcement of administrative subpoenas." *United States v. Tennessee Walking Horse Breeders' & Exhibitors' Ass'n*, 727 Fed. Appx. 119, 124 (6th Cir. 2018). However, as the Sixth Circuit has explained:

> [A]lthough Rule 45 does not apply directly to administrative subpoenas, Rule 81 makes clear that district courts have discretion to apply the federal rules generally to proceedings to enforce administrative subpoenas. Fed. R. Civ. P. 81 advisory committee note (1946). The language of the Rule 'allows full recognition of the fact that the rigid application of the rules in the proceedings themselves may conflict with the summary determination desired,' and Rule 81 'is drawn so as to permit application of any of the rules in the proceedings whenever the district court deems them helpful.' *Id; see United States v. McCoy*, 954 F.2d 1000, 1004 (5th Cir. 1992) ("The effect of Rule 81(a)[5] is to give district courts discretion in a wide variety of subpoena enforcement proceedings to tailor the Federal Rules to the particular needs and purposes of the proceeding."). Thus, Rule 45 may be utilized by courts considering administrative subpoenas under Rule 81, at the discretion of the district court. At least two of our sister circuits have considered Rule 45 in this context. *See Maryland Cup*, 785 F.2d at 477–78; *Friedman*, 532 F.2d at 936.

*Id*. at 124-125. *See also United States v. Friedman*, 532 F.2d 928, 937-938 (3rd Cir. 1976); *Equal Employment Opportunity Commission v. Kronos, Inc*., 694 F.3d 351, 371-372 (3rd Cir. 2012).

Accordingly, the Court will look to Rule 45 in evaluating the Corporate Entities' request to shift the costs of compliance with the administrative subpoenas at issue. Under that Rule, "a party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing

9

undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). *See also In re Modern Plastics Corp.*, 890 F.3d 244, 250-251 (6th Cir. 2018). "Undue burden is to be assessed in a case-specific manner considering 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *In re Modern Plastics Corp.*, 890 F.3d at 2501-251 (quoting *Am. Elec. Power Co., Inc. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996)). Courts must "balance the need for discovery against the burden imposed on the person ordered to produce documents," and the status of that person as a non-party is a factor. *Id.*

The court for the district where compliance is required must enforce the duty to avoid imposing undue burden on a subpoena recipient and order an appropriate sanction on a party or attorney who fails to comply. *Id.* Applying Rule 45 in the context of requests to shift costs incurred in complying with administrative subpoenas, courts have held that district courts possess the authority to require the government to reimburse non-party subpoena recipients for the reasonable cost of production of requested records. *See Friedman*, 532 F.2d at 938; *Kronos,* 694 F.3d at 371-372. "[T]he primary consideration in fairly allocating the cost of compliance with an administrative subpoena is whether the cost of compliance with the subpoena 'exceed[ed] that which the respondent may reasonably be expected to bear as a cost of doing business.'" *Kronos,* 694 F.3d at 371-372 (quoting *Friedman,* 532 F.2d at 938)).

For the following reasons, the Court finds that the Corporate Entities waived their right to seek reimbursement costs because they failed to either object to the subpoenas on the basis of undue burden, or advise the United States that they intended to seek reimbursement of costs prior to

production. The Court, therefore, declines to shift the costs incurred by the Corporate Entities in responding to the administrative subpoenas, to the United States.

The docket reflects that the Corporate Entities produced some documents in response to the administrative subpoenas in April 2018 (Doc. No. 104-6) and January 2020 (Doc. No. 104-10). At no time between the issuance of the subpoenas and these partial productions did the Corporate Entities challenge the subpoenas on the grounds that they were overbroad and/or unduly burdensome, or otherwise attempt to negotiate with the United States regarding the scope and breadth of the requested materials. Nor did the Corporate Entities advise the United States that they intended to seek reimbursement of costs associated with production in response to the subpoenas.

After the United States filed its Motion to Enforce Subpoenas (Doc. No. 110), the Corporate Entities filed a Brief in Opposition in which they argued that the administrative subpoenas were improper on various legal grounds. (Doc. No. 117.) Notably, however, the Corporate Entities did not argue that the subpoenas were overly broad or unduly burdensome. (*Id.*) Further, the Corporate Entities did not ask the Court to narrow the subpoenas nor did they either seek reimbursement for the costs of production or reserve the right to seek such reimbursement. (*Id.*)

The Court granted the government's Motion to Enforce on September 15, 2020 and the Corporate Entities produced over 35,000 responsive documents two months later, on November 13, 2020 (Doc. No. 124-2.) The Corporate Entities do not direct this Court's attention to any evidence that, between these two dates, they asked the United States to work with them to narrow the scope of the documents requested or that they notified the United States that they intended to seek reimbursement of the costs of production. Rather, it was only after the Corporate Entities produced

11

the responsive documents at a cost of $13,736.60 in expenses that they raised the issue of costs and moved the Court for an Order shifting the costs to the United States.

Under these circumstances, the Court finds that the Corporate Entities waived the right to seek reimbursement costs. Although they had ample opportunity to do so, the Corporate Entities failed to timely raise the issue of overbreadth and/or undue burden, either in informal negotiations with the United States or in their Brief in Opposition to the United States' Motion to Enforce. They also failed, at any point in time since the subpoenas were issued in 2018, to notify the United States that they intended to seek reimbursement or expressly reserve the right to do so. Faced with similar circumstances, courts have declined to award costs under Rule 45. *See, e.g., McCabe v. Ernst & Young*, 221 F.R.D. 423, 426-427 (D. N.J. 2004) (finding that non-parties who failed to object to subpoenas or condition compliance on reimbursement were not entitled to award of attorney's fees and other costs); *Spears v. First American Eappraiseit*, 2014 WL 6901808 at * 3- 4 (N.D. Cal. Dec. 8, 2014) (declining to award costs of production to subpoena recipient where recipient failed to inform plaintiffs that it would seek reimbursement of costs "until well after production was underway or complete"); *Herrington v. Babcock Law Firm, LLC,* 2014 WL 4996182 at * 4 (M.D. La. Oct. 7, 2014) (declining to award costs where subpoena recipient partially complied with subpoena but failed to condition compliance on reimbursement and noting that "[b]oth the subpoenaing party and the Court were deprived of any opportunity to address Movants' concerns regarding the scope of the requests or the costs of production.")[2] *See also* c*f. In re Modern Plastics,* 890 F.3d at 252-253 (affirming

---

[2] The Corporate Entities argue (summarily) that "the law does not require a non-party to seek reimbursement before compliance." (Doc. No. 127 at p. 5.) The cases cited by the Corporate Entities for this proposition are distinguishable. In *United States v. Columbia Broadcasting Systems, Inc*., 666 F.2d 364 (9th Cir. 1982), the subpoena recipients expressly reserved the right to seek reimbursement of response costs and kept the court and the parties fully informed of their progress and expenses. Likewise, in *In re First American Corp*., 184 F.R.D. 234 (S.D.N.Y. 1998), the subpoena recipients

12

bankruptcy court order shifting costs of responding to subpoenas where "the record showed that [the recipients] specifically objected to the burden and expense of complying with the subpoenas, communicated concerns about the amount of work and expense that would be required to comply, invited efforts to narrow the search terms and/or custodians subject to the requests and, ultimately, did not produce the documents until required to do so.")

Moreover, the Court is particularly disinclined to grant costs in light of the United States' assertion that (1) the Corporate Entities reproduced to the government documents that the FBI gave to the Corporate Entities after the execution of the search warrants; and (2) "there are numerous patient files in the productions that are outside the scope of the subpoenas." (Doc. No. 132 at pp. 5-6, 11.) Notably, the Corporate Entities did not file a response to this argument and, therefore, these factual assertions are unopposed. Thus, it appears that the Corporate Entities not only failed to ask either the United States or the Court to narrow the scope of the administrative subpoenas, but also overproduced documents in response thereto. Under these circumstances, the Court finds an order shifting the costs to the United States to be unwarranted.

### III.   Conclusion

Accordingly, and for all the reasons set forth above, the Corporate Entities' Motion to Shift Costs (Doc. No. 124-1) is DENIED.

**IT IS SO ORDERED.**

Date: May 4, 2021

　_s/Pamela A. Barker_　
PAMELA A. BARKER
U. S. DISTRICT JUDGE

---

"raised the issue of costs many times prior to producing the documents." *Id*. at 239. Here, however, the Corporate Entities failed to direct this Court's attention to any evidence that they reserved the right to seek reimbursement or otherwise raised the issue of costs prior to production.